[Civ. No. 4351. Fourth Dist. Apr. 21, 1952.]

GRACE BRADLEY et al., Respondents, v. FRAZIER PARK PLAYGROUNDS, INC. (a Corporation) et al., Defendants; HARRY H. HOLLAND, Appellant.

William R. Hulsy for Appellant.

Siemon & Siemon for Respondents.

GRIFFIN, J.—In 1924, a real estate promotion was commenced by a group of real estate operators who had organized, in August, 1924, a corporation known as "Frazier Mountain Park and Fisheries Company, Inc." This corporation secured about 800 acres of real property for subdivision purposes lying to the west of United States Highway 99, approximately on the borderline between Kern County and Ventura County, in the mountainous area just south of Lebec. One Harry G. MacBain was president and the moving spirit in its promotion. In the heart of the subdivision was a playground area con-

sisting of about 10 or 12 acres, sometimes designated in the evidence as the "commons." It contained some springs and a grove of trees through which flowed the Cuddy Creek. Artificial lakes were excavated to take advantage of certain waters which were there available. Subdivision maps of the several tracts were duly recorded and lots were sold according to said maps. The entire subdivision contained in excess of 1,700 numbered lots. The general subdivision map (Exhibit 1) which does not appear to have been recorded, designated the numbered lots and showed the unnumbered area containing the "commons" and the lakes above described. A footnote is set forth on that map as follows: "All streets, trails, drives, or unnumbered areas adjacent thereto, are reserved for the use of owners of real property within said subdivision and are not dedicated to the public."

The rustic clubhouse or lodge was erected in this unnumbered area which was used as a meeting place for the residents and property owners and which was also used as the focal point in the promotion of the sale of lots in the subdivision. The Frazier Park Water Company, a corporation, was organized in March, 1926, for the purpose of producing and distributing water to the lots in the subdivision. Upon the completion of payments, after the sale of the lots, each purchaser of a lot was entitled to receive two shares of stock in the water company.

Mr. MacBain and his associates envisioned the area as being a natural resort and playground spot, and took the steps which they considered necessary to make it so. Five artificial lakes were constructed in the playground area of the property. Cabins were erected for rentals, and the real estate promotion boomed. A large number of lots were sold for cabin sites, and many summer homes were erected within the subdivided portions of the area.

One of the selling points for the lots was the representation that with each lot the purchaser would receive the right to membership in a "Rod and Gun Club" (later to be called a "Rod and Reel Club") which club would own and operate the clubhouse and grounds, and which would maintain fish in the lakes, and would carry on the usual activities of a country club. Membership in the club was to be based either on ownership of lots in the subdivision or could be purchased by nonlot owners at the discretion of the board of directors of the club. The printed matter furnished to potential pur-

chasers suggested that the club membership would increase in worth and be of great value. The Frazier Mountain Park and Fisheries Company, Inc., on October 8, 1928, borrowed a sum up to $400,000 on bearer promissory notes, secured by a trust deed, not only on all of the unsold lots in the tracts numbered 1 to 5 inclusive, in the area, but also the lots which had been sold on contract, and in addition, all of the unsubdivided portion of the land, including the area on which the lakes, playgrounds, and clubhouse were situated. The Metropolitan Trust Company was named as trustee under the deed of trust.

All of the expenses incident to the clearing of the playground area, the building of the clubhouse, the excavation for the lakes, the stocking of the lakes with fish, and the care and maintenance of the area, were borne by the real estate promoters up to the time that the Frazier Mountain Rod and Reel Club was created on March 1, 1926. (MacBain's attorney was one of the incorporators.) After that time the Rod and Reel Club operated the clubhouse and the grounds, stocked the lakes with fish, and generally conducted the area in the normal manner for the benefit of its members, collecting dues, incurring expenses for the pumping of the water into the lakes, stocking them with fish, and paying out money for care and improvements on the grounds. In 1933 the Rod and Reel Club was permitted to lapse into inactivity from which it has never revived. Its unpaid obligation to the water company for water pumped into the lakes amounted to approximately $9,000.

The Frazier Mountain Park and Fisheries Company, Inc., and its successor, the Harry G. MacBain Corporation, Ltd., used the usual and customary type of contract of sale for real property, which contained the words: "It is further agreed that the seller shall not be responsible or liable for any inducement, promise, representation, agreement or stipulation not set forth herein." On its face it contained no grant of membership in the Rod and Reel Club, but on the reverse side there was printed: "Sample of Membership given with each lot," and "This certifies that —— is a member of the Frazier Mountain Park Rod and Reel Club and entitled to all the benefits and privileges thereto." The face of the deed contained merely the usual grants and restrictions, and contained no reference to the shares in the water company, the membership in the Rod and Reel Club, or any of the easements or rights here claimed.

From the inception of the subdivision, apparently there was great emphasis placed on the value of the area as a playground spot, and the fact that the property owners would be able to use the lakes, the clubhouse, the playgrounds and the picnic grounds, through their membership in the Rod and Reel Club and by virtue of their ownership of the lots. During the trial there were numerous bits of testimony in which persons who later purchased lots, or who were considered as prospects, were told by salesmen for the owners that the whole area would be permanently available to them for their use as a playground. Also, advertisements were introduced into evidence which had been taken from local newspapers, etc., showing that there was a great deal of emphasis placed on the fact that the area would be devoted to use as a playground and that ownership in the lots would carry with it the right to catch fish in the various lakes. Salesmen employed by the owners also testified that they made these representations to prospective purchasers and that the permanent use of the playgrounds and lakes was without restriction. Several salesmen testified that Mr. MacBain and his sales agent authorized them to so represent the property to the prospective lot buyers. Many of the purchasers who testified stated that they relied on these representations and the court, by its decision, at least impliedly found that this was true.

It appears that the 1929 depression so affected the area that the sale of lots fell off, and the real estate promotion bogged down. By 1931, most of the activities of the area ceased, including the full operation of the clubhouse, the lakes, the grounds and the water company.

In 1931, a group of residents undertook to operate the water company in order to supply water to the residents. Ultimately, a public utility district was formed, and the furnishing and distribution of water was taken over by the defendant Frazier Park Public Utility District, a public corporation.

The Harry G. MacBain Corporation, Ltd., kept a caretaker on the premises until 1932, when possession was released to the Metropolitan Trust Company, as trustee, under the deed of trust above mentioned. The clubhouse grounds and lakes were used occasionally by the residents and property owners and on occasion the clubhouse was open to groups for rental with the permission of the caretaker.

On July 19, 1940, the Pacific Capital, Ltd., a corporation, filed an action in the Superior Court of Los Angeles County

against the Metropolitan Trust Company, as trustee, and against the owners of the bearer notes which had been given at the time of the floating of the loan. It prayed, among other things, that Harry G. MacBain Corporation surrender its bearer notes to the trustee in exchange for a quitclaim deed from the Metropolitan Trust Company to the purchasers who had purchased lots from the Frazier Mountain Park and Fisheries Company, Inc., or from the Harry G. MacBain Corporation, Ltd., its successor, which purchasers had paid the full purchase price for the property, but for which there had been no release secured from the trust company. It also asked that the trustee be instructed to dispose of the property because of the fact that the trustor corporation had for many years failed to operate the clubhouse, swimming pool, playgrounds, lakes, and other improvements on the property, and that the trust company had advanced sums to pay taxes and insurance on the clubhouse and upon the improved portions of the unsubdivided property, and because it had been forced to maintain, at its expense, a caretaker on the property. That court granted the relief prayed for and ordered the trust company to immediately take measures looking toward the sale of the trust property to defray costs of administration of the trust, and ordered that any balance be paid to the bearers of the promissory notes.

The trust company unsuccessfully attempted to sell the real property to the county of Kern to be used by the county as a recreational area for $12,500. Subsequently, the Frazier Park Playgrounds, Inc., a corporation, was formed by defendant Harry H. Holland for the purpose of purchasing the property. In December, 1941, it purchased the property, including the clubhouse, grounds, and lakes, from the trust company for $12,500, on an agreement of sale by the terms of which the corporation took title to the property and gave back a deed of trust for $7,500, being the unpaid balance of the purchase price. The unsold lots in the subdivision were quitclaimed by the trust company to the Frazier Park Playgrounds, Inc., because many of them had been forfeited to the state for unpaid taxes. The unsubdivided portion of the property was conveyed to the Frazier Park Playgrounds, Inc., by grant deed. Thereafter, the Frazier Park Playgrounds, Inc., attempted to open the clubhouse commercially but it was never able to operate it on a profitable basis. Thereafter, there was occasional use of the swings, croquet court, clubhouse and horseshoe pits by residents and lot owners.

In 1947, the Frazier Park Playgrounds, Inc., fenced the clubhouse and the playgrounds, and permitted cattle to graze in the enclosed area. This act was met with strong disapproval by persons who owned lots in the subdivided portion of the area, and this action was filed by four of them, as representatives of a class, to have their rights determined to the use of the clubhouse, playgrounds, swings, right to take water, and to fish in the lakes without hindrance.

Plaintiffs' complaint alleged all of the facts hereinabove mentioned and prayed that the rights of the plaintiffs, as members of a class, be recognized by law, and enforced, and that the defendant Frazier Park Playgrounds, Inc., be required to remove its fence, and that it grant the plaintiffs, as members of a class, the right to perpetual use of the clubhouse, lakes, playgrounds, and other improvements within the unsubdivided area.

Defendant Frazier Park Playgrounds, Inc., answered that it was a successor in interest of the Metropolitan Trust Company which had sold the trust property at a distress sale, under instructions from the court. It denied that the plaintiffs had any rights to the property and alleged that this property had remained unused for many years. However, it failed to specifically plead abandonment of these claimed rights by the plaintiffs.

The court found generally in accordance with the allegations of plaintiffs' complaint, including the allegations that the grounds which included the springs constituted a natural park and that the property which was subdivided had been sold to the public, with the representation that the area, which contained the swings, playgrounds, walks, artificial lakes, and clubhouse, including the springs, had been sold to purchasers with the representation that they would be entitled, perpetually, to the use thereof; that these claimed rights were at all times open and notorious and of common knowledge. It specifically found that there had been no *public* dedication of this area for the purposes indicated. Judgment was entered accordingly and by mandatory injunction the court specifically designated the property to which the easement related and granted unrestricted and uninhibited ingress thereto and egress therefrom by the property owners, and restrained appellant Harry H. Holland, successor in interest to the Frazier Park Playgrounds, Inc., and his agents, from in any manner interfering with or obstructing said uses, and further ordered that a prescribed portion of the

fence surrounding the area be removed, and required the defendants to permit the owners of lots in said tracts to have ready access to the same and to the clubhouse and to the other improvements thereon, without hindrance, subject, however, to certain prescribed rules. It was ordered that plaintiffs take nothing against defendant Frazier Park Public Utility District, a corporation.

Harry H. Holland, as successor in interest of the Frazier Park Playgrounds, Inc. appealed from the judgment.

The evidence fully supports the court's finding that it was the intention of the subdivider and of its sales agents to create and set aside a portion of the subdivision as a "commons" or playgrounds, for the specified use and benefit of the purchasers of lots, in perpetuity. The subdivision map so indicates. The price obtained for the lots clearly indicates such rights were considered a portion of the price paid. Appellant Holland and his predecessors in interest apparently had knowledge of these facts or, at least, evidence of these claimed rights and privileges was, as found by the court, so notorious and of such common knowledge as to impart notice to them.

The evidence shows that Holland lived near the park before, during and after its inception and visited it during the sale and promotion of the tract; that in 1935, he bought adjoining land; that in 1941, he and a lot owner in the park who purchased his lot on the representation that the unsubdivided portion was reserved for the use of the lot owners, joined in forming the Frazier Mountain Park Playgrounds, Inc., for the purpose of buying a portion of the tract with the idea of conducting a private park enterprise. (Holland subsequently purchased this lot owner's interest in the corporation.)

In *Ocean Shore R. Co.* v. *Spring Valley Water Co.*, 218 Cal. 86 [21 P.2d 588], the court held that every person having actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact is charged with constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact. That case quoted with approval from *Chicago & E. I. R. Co.* v. *Wright*, 153 Ill. 307 [38 N.E. 1062], wherein it is said (quoting from *Indiana, B. & W. R. Co.* v. *McBroom*, 114 Ind. 198 [15 N.E. 831]):

" ' "A person who is about to purchase land upon which a grade for a railroad is constructed is warned that there is

some claim of right, and if he fails to make proper inquiry as to the nature of the claim he buys at his peril. . . . A man cannot buy property where there are facts known to him sufficient to put him upon inquiry, and hold it free from prior claims or equities of which due inquiry would have given him information." ' " (See, also, *Wallace* v. *Whitmore,* 47 Cal.App.2d 369, 374 [117 P.2d 926]; *De La Cuesta* v. *Bazzi,* 47 Cal.App.2d 661, 668 [118 P.2d 909]; and 74 A.L.R. 1250; 9 Cal.Jur. p. 956, § 10.)

The main question involved is the authority of the trial court to hold that the property owners in the area were entitled to a so-called "equitable easement" to the use of the grounds, clubhouse, and lakes, where no such right of use or easement was granted by the written conveyance.

It was said in *Danielson* v. *Sykes,* 157 Cal. 686 [109 P. 87, 28 L.R.A.N.S. 1024], that where a lot conveyed by deed is described by reference to a map, such map is made a part of the deed; that if streets are marked on the ground in the absence of a map, and lots are sold on the representation that such streets exist, the appurtenant right to use the streets, not expressed in the deed, rests upon an equitable estoppel; that the right of the owner may be enforced in equity with respect to all the streets which the particular lot owner has occasion to use; and any street or alley in close vicinity to a lot owner, which either is or may become of substantial benefit to him, will be protected against closure by injunction. *Prescott* v. *Edwards,* 117 Cal. 298 [49 P. 178, 59 Am.St.Rep. 186], as well as many other authorities, are cited therein. (See, also, *Davidow* v. *Griswold,* 23 Cal.App. 188, 192 [137 P. 619]; Civ. Code, § 801 et seq.; Civ. Code, § 1104.) The authorities cited support the findings and judgment of the court.

█ The remaining question involves the ruling of the trial court in denying to appellant the right to amend his answer to include the defense of abandonment of the easement claimed by reason of the nonuser thereof for over 14 years. No abuse of discretion appears in this respect for several reasons. First, it was not originally alleged as one of the defenses to said action. Second, mere nonuser does not necessarily constitute abandonment. (1 Cal.Jur. p. 12, § 8; *People* v. *Southern Pac. Co.,* 172 Cal. 692 [158 P. 177]; *Flanagan* v. *San Marcos Silk Co.,* 106 Cal.App.2d 458 [235 P.2d 107].) The showing here made does not indicate that the lot owners, as such, had abandoned or intended to abandon any of the so-

called rights herein claimed, nor is there any offer of proof indicating this fact. (*Ocean Shore R. Co.* v. *Spring Valley Water Co.*, 87 Cal.App. 188 [262 P. 53].) It further appears that the trial judge did give some consideration to this contention and in his written opinion, as pointed out by appellant, the court did make a direct finding that there was no abandonment and that the showing of nonuser was the only possible evidence of abandonment produced. It therefore does not appear that appellant would have been successful had the court permitted him to plead abandonment. No prejudicial error appears in the ruling of the trial court.

Judgment affirmed.

Barnard, P. J., and Mussell, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 19, 1952.