688 P.2d 682

**SHALIMAR ASSOCIATION, an Arizona non-profit membership corporation, et al., Plaintiffs-Appellees,**

v.

**D.O.C. ENTERPRISES, LTD., an Arizona corporation; Steven Otto and Maryleah Frances Otto, his wife; William H. Dockman and Vera Dockman, his wife; George Chicules and Gloria Chicules, his wife, Defendants-Appellants.**

No. 1 CA–CIV 5330.

Court of Appeals of Arizona,
Division 1, Department D.

March 27, 1984.

Reconsideration Denied May 8, 1984.

Review Denied Sept. 18, 1984.

chel & Jenckes, P.C., Phoenix, for defendants-appellants.

Daughton Feinstein & Wilson by Allen L. Feinstein, R. Stewart Halstead, Phoenix, for plaintiffs-appellees.

## OPINION

FROEB, Judge.

This case involves an attempt by the new owners of a golf course to develop the property for other purposes. No specific restriction as to the use of the land was ever placed of record with the county recorder. The surrounding homeowners brought this action to have the court declare and enforce against the new owners an implied restriction limiting the use of the property to a golf course. We hold that a covenant restricting the use of the property is implied from the facts and circumstances and is enforceable against the new owners because they are not bona fide purchasers without notice.

### BEFORE THE PURCHASE BY APPELLANTS

Shalimar Estates is a residential land development consisting of 134 acres located in Tempe, Arizona. The development consists of a golf course and adjacent residential lots (hereafter referred to as the Shalimar property). The original developer of the Shalimar property was Karl Guelich and Associates, a corporation. Guelich and Associates acquired the Shalimar property in March of 1960 through what is known as a subdivision trust agreement under which Guelich and Associates was the equitable owner and Phoenix Title and Trust Company (later succeeded by Arizona Title Insurance Company) was legal owner and trustee. The agreement provided that Guelich and Associates had the right to instruct Phoenix Title to record plats and impose restrictions on the Shalimar property.

Upon acquiring this land, Guelich and Associates designed a golf course which was intended as an integral part of the general plan for the development and improvement of all the Shalimar property.

Porter Kempton Tobler & Gwilliam by Bernald C. Porter, Tempe and Evans, Kit-

The plan, including the golf course, was for the purpose of inducing people to buy property in the Shalimar subdivisions and was intended to be for the benefit of those purchasers and their successors in interest. A map showing the proposed development was shown to potential lot buyers and was recorded in the office of the Maricopa County Recorder in August 1960.

Guelich and Associates also caused to be recorded for Shalimar Estates certain restrictions which contained three paragraphs referring to a golf course:

5. No structure shall be located nearer than thirty feet to any property line abutting on the *golf course property;*

. . . .

\* \* \* \* \* \*

9. No fence, wall or hedge over 2½ feet high shall be constructed or maintained within the area lying between the front of any building and the front or street property line. No fence, wall or hedge over 6 feet high shall be constructed or maintained on any portion of a lot. Landscaping shall be planned in this area so as to avoid undue obstruction of the *view of the golf course* from the lots, and all property lines abutting on *the golf course* shall be fenced with 3 feet high grape stake fencing or equivalent.

\* \* \* \* \* \*

17. It is contemplated that a *golf course* may be constructed on that certain part designated as Tract "A" in SHALIMAR ESTATES, and the terms "golf course property" and "golf course" as used herein shall *mean the golf course which may be constructed* on those tracts as shown by the recorded plat of SHALIMAR ESTATES. (emphasis added)

No restrictions were recorded against the golf course property itself (sometimes referred to as "Tract A"). The golf course was constructed in 1960 and 1961 in accordance with the configuration and dimensions shown on the recorded plat.

After this, on October 29, 1963, restrictions were recorded for the residential lots in Shalimar Estates addition number one, which included essentially the same provisions as those earlier quoted, allowing for minor changes.

Other recorded documents included references to golf course restrictions. For example, the recorded plat for the Shalimar West subdivision shows an easement for a golf cart path, and the recorded plat for Shalimar Estates addition number four contains a grant of a private irrigation easement to Shalimar Golf Club for its "use and enjoyment and its attendant liabilities of upkeep, maintenance and care." In addition, brochures and sales materials which depict and describe the golf course were placed on file as a public record with the Arizona Department of Real Estate.

Residential lot sales began in 1961. The brochures provided to lot purchasers showed a golf course surrounded by numbered home lots.

Sales were made with representations that the golf course would be maintained as such until the year 2000, with provision for an extension of 25 years. The duration of this promise was to be the same as the period of the recorded restrictions, which provide that the restrictions shall run "until January 1, 2000 A.D., after which time they shall be automatically extended for a period of 25 years unless an instrument signed by a majority of the then owners of the lots has been recorded agreeing to change the same in whole or in part."

Salesmen for Guelich and Associates promised to develop, maintain, and operate the Shalimar Golf Course for the benefit of residential lots developed by Guelich and Associates. A higher price was charged for lots adjoining the golf course, and they have a greater value because of the existence of a golf course. The homeowners chose lots after looking at the plat prepared by Guelich and Associates showing the golf course and after considering the location of the lots with respect to the golf course.

The trial court found that when the homeowners acquired their property, sales materials, brochures, maps, and plats were

shown and given to them and representations and statements were made to them on the basis of which they had reason to, and did, understand and believe that the golf course would continue to be maintained and used as a golf course. In addition to the specific representations made by salesmen of the developer, Guelich and Associates, there were representations made in the sales materials that:

All residents of the subdivision will have access [to the golf course] by membership . . . . You automatically receive a family membership in Shalimar Country Club . . . . A special "drawing card" for home buyers is the fact that Shalimar Estates homes encircle the attractive Shalimar Golf Course . . . .

Golf course memberships included at no charge . . . .

Shalimar Estates is an exclusive subdivision with 150 homesites. Included in the plans are a new clubhouse for the nine hole golf course to which all residents will have access by membership . . . .

Free membership in Shalimar Country Club . . . .

The trial court also found that the homeowners relied on the plats, sales materials, and statements, and were induced to buy property and to build homes, in part, because the golf course provided an open space and park-like environment for their families, because the continued use and maintenance of the golf course insured that it would not be developed for other homes or businesses, and because they, the homeowners, would be able to join the golf club and play golf next to their homes.

The trial court found that the homeowners who purchased lots adjoining the golf course had a right to rely and did in fact rely upon the representations made to them that the use of the golf course was restricted to that purpose for the term of the restrictions.

The court also found that the homeowners who purchased lots adjoining the golf course would not have bought those lots except for the presence of the golf course and representations that its use was re-stricted to a golf course and that it would be maintained for that purpose for the term of the restrictions.

Shalimar Golf Club, Inc., an Arizona corporation, was formed by the principals of the developer and others for the purpose of maintaining and operating the Shalimar Golf Course and it did so from 1961 until July 2, 1979, when the appellants acquired it. In 1976, L.B. Hill and Jane Hill, his wife (the Hills) purchased the subject property from Guelich and Associates and Shalimar Golf Club, Inc. The Hills continued to maintain and operate it as a golf course until July 2, 1979, when they sold it to appellants. All of the prior owners believed the golf course property was required to be used as a golf course and operated it as such.

## THE PURCHASE BY APPELLANTS

We turn now to the involvement of appellants. They first became interested in the property in July 1978 when one of the individual appellants, Steven Otto, visited Phoenix. Otto is an attorney licensed to practice in Canada and has specialized in real estate matters. The other individual appellants, Chicules and Dockman, also Canadians, are experienced real estate agents. All of the individual appellants are experienced in real estate investments.

The golf course was operating during Otto's first visit, but it did not appear to him to be doing well. Otto was informed that the property was not for sale, and no negotiations were commenced.

Appellants' real estate agent later approached L.B. Hill and convinced him to begin negotiations for the sale of the golf course. In November 1978, appellants came to Arizona, and in the period that followed presented several offers.

The first offers which appellants made to Hill for the purchase of the golf course contained the following contingency:

Sale contingent upon all of the following:
a. Verification by Phoenix Title and Trust or any qualified successor, that paragraph number 17 of a declaration of

restrictions attached hereto being Docket 3389 does not affect the lands in Tract A [the golf course] and that there is nothing on the title to prevent the development of the land on Tract A in accordance with proper zoning laws . . . .

Paragraph 17 referred to in the contingency is the provision in the restrictions quoted earlier which mentions a golf course on Tract A. Hill refused the offers which contained this contingency. Hill told appellants that if the subject property could be used for a purpose other than a golf course, the property would be worth $2,000,000 rather than the $685,000 he was seeking for it. Appellants understood this to mean that Hill thought the subject property had to remain a golf course.

Prior to purchasing the golf course, appellants saw the recorded plats for Shalimar Estates and Shalimar West which showed Tract A, the golf course property, surrounded by residential lots. They also saw the restrictions, which contained numerous references to the golf course, and the plat for Shalimar West, which contains an easement for a golf cart path.

Appellants saw and drove on the golf course and knew that it was surrounded by homes with a view overlooking it. They knew that the configuration of the existing golf course was virtually identical to the configuration of Tract A on the recorded plat.

Appellants also received a preliminary title report, which stated that it did not insure "against loss by reason of any facts, rights, interests, or claims which are not shown by public record but which could be ascertained by an inspection of the land or by making inquiry of persons in possession thereof."

Appellants were informed by City of Tempe officials that any development of the area would be "highly controversial" and would be vigorously opposed by the homeowners. Appellants made no inquiry of and had no discussion with City of Tempe officials as to any legal restrictions on the property other than zoning.

Appellants intentionally made no inquiry of the developer, Mr. Guelich, or of any homeowners in the area.

The case was tried to the trial court without a jury and decided in favor of the homeowners. The trial court found that had appellants inquired of Mr. Guelich or the homeowners, they would have been informed that restrictions existed. L.B. Hill testified that "it was a pretty well known fact that it was restricted to a golf course operation."

Pursuant to the terms of their purchase of the golf course and adjoining facilities, appellants paid $685,000, which the trial court found is approximately the value of a golf course like Shalimar. Of the total purchase price, Hill and appellants allocated $130,000 for equipment, $320,000 for the buildings on the property, $60,000 for the water system, $12,500 for goodwill, and $12,500 for a covenant not to compete by Hill in a business similar to the operation of Shalimar Golf and Country Club. Only $150,000 was allocated to the real property.

The trial court found that at or prior to the time they acquired their interest in the subject property, appellants had actual or constructive notice, and they had information on the basis of which they had a duty to inquire and thereby would have learned of the golf course restrictions.

The trial court found that appellants were not bona fide purchasers without notice.

In addition to extensive findings of fact, many of which have been previously referred to, the court concluded that appellants were bound to maintain Tract A as a golf course until the year 2025 A.D. The trial court found:

The Shalimar subdivisions are currently long established, high quality residential areas surrounding a golf course. The homes are designed to and do take advantage of the open area afforded by the golf course. The general plan of development had not been changed and the purpose for the golf course has not been defeated or frustrated by any change in the Shalimar subdivisions. The restric-

tions as to golf course usage is reasonable and in keeping with the general plan of development.

## WERNER v. GRAHAM DISTINGUISHED

The issue we must decide is whether restrictions upon the use of land may arise other than by deed or written instrument so as to bind a purchaser with notice.

Appellants argue that the Arizona Supreme Court long ago adopted *Werner v. Graham*, 181 Cal. 174, 183 P. 945 (1919) which held that an equitable servitude in favor of one parcel of land and against another must be created by a written instrument. They point out that *Werner v. Graham* was relied upon in *Palermo v. Allen*, 91 Ariz. 57, 369 P.2d 906 (1962), and most recently by Division Two of the Court of Appeals in *Colonia Verde Homeowners Association v. Kaufman*, 122 Ariz. 574, 596 P.2d 712 (1979).

The homeowners reply that *Werner v. Graham* does not apply in this situation because it does not deal with the enforcement of a promise against a common grantor or his successor with notice but rather with the enforcement of claimed reciprocal land restrictions *between grantee owners*. They say that the enforceability of the restriction in this case is supported by a line of cases, the primary example of which is *Ute Park Summer Homes Association v. Maxwell Land Grant Co.*, 77 N.M. 730, 427 P.2d 249 (1967).

We find that *Werner v. Graham* does not apply to the facts of this case. In *Werner*, the lot owners were not seeking in common to enforce restrictions against the common grantor or his successor, but were seeking to enforce what were claimed to be recorded mutual restrictions against other lot owners. This is true also of *Colonia Verde Homeowners Association v. Kaufman* and *Riley v. Bear Creek Planning Committee*, 131 Cal.Rptr. 381, 551 P.2d 1213 (1976). The lot owners in those cases argued unsuccessfully that the restrictions recorded as to some, but not all, of the lot owners were part of a general lot sale scheme and became binding on property conveyed by the developer to a lot owner even though no such restriction was recorded with respect to his property.

In the present case, it is property *retained* by the developer for a special purpose on which the homeowners sought to impose the restriction. The homeowners are seeking not to enforce among themselves mutual restrictive covenants, but to enforce the promise of the developer as to the use of land retained by him. The developer retained the land and sold surrounding lots with the promise that the land retained would be used only as a golf course. *Werner v. Graham* does not apply to such a promise:

> This whole discussion may in fact be summed up in the single statement that, if the parties desire to create *mutual rights* in real property *of the character of those claimed here*, they must say so, and must say it in the only place where it can be given legal effect, namely, in the written instruments exchanged between them which constitute the final expression of their understanding. (emphasis added)

181 Cal. at 185, 183 P. at 949.

The purpose for the rule set forth in *Werner v. Graham* is explained in *Riley v. Bear Creek Planning Committee* as follows:

> Where, however, mutually enforceable equitable servitudes are sought to be created outside the recording statutes, the vindication of the expectations of the original grantee, and for that matter succeeding grantees, is hostage not only to the good faith of the grantor, but, even assuming good faith, to the vagaries of proof by extrinsic evidence of actual notice on the part of grantees who thereafter take a part of the servient tenement either from the common grantor or as successors in interest to his grantees. The uncertainty thus introduced into subdivision development would in many cases circumvent any plan for the orderly and harmonious development of such properties and result in a crazy-quilt pat-

tern of uses frustrating the bargained-for expectations of lot owners in the tract. 131 Cal.Rptr. at 389–90, 551 P.2d at 1221–22.

In the present case, there is no danger of a "crazy-quilt" development. The restriction here applies only to the parcel of land retained by the developer. The uncertainty sought to be avoided in *Werner v. Graham* when mutually enforceable servitudes are involved among a large number of homeowners is not present here.

There is no principle in *Palermo v. Allen*, the Arizona Supreme Court decision relying upon *Werner v. Graham*, which is compromised in this case. *Palermo* was a suit by grantees of subdivided land seeking a declaration that they were not bound by certain deed restrictions imposed upon their predecessor in title by the common grantor. The court interpreted restrictive language in a deed and found it did not constitute a covenant running with the land for the benefit of subsequent purchasers. The case relied upon *Werner v. Graham* for the principle that the deeds must make reference to a general plan or mention that the restrictions were meant to inure to the benefit of the other lot owners. Otherwise, the restrictions are deemed to benefit only the specific grantee.

Finally, appellants argue that restrictions upon the use of land are in derogation of the natural right which an owner possesses to use and enjoy his property and are not favored in the law. Consequently, they argue, restrictive covenants are construed strictly against their establishment and effect and liberally in support of the unrestricted use of the land. *See Duffy v. Sunburst Farms East Mutual Water & Agricultural Company, Inc.*, 124 Ariz. 413, 604 P.2d 1124 (1980); *Palermo v. Allen; O'Malley v. Central Methodist Church*, 67 Ariz. 245, 194 P.2d 444 (1948); *Carter v. Conroy*, 25 Ariz.App. 434, 544 P.2d 258 (1976); *Grossman v. Hatley*, 21 Ariz.App. 581, 522 P.2d 46 (1974). Although we readily recognize these principles, they are not in conflict with our deci-

sion in this case. There is more than sufficient evidence to support the conclusion of the trial court and to overcome the presumption set forth.

## STATUTE OF FRAUDS AND PAROL EVIDENCE RULE

 We next address the application of the Statute of Frauds to the case. An oral agreement for the sale of real property or an interest therein is unenforceable by reason of the Statute of Frauds. A.R.S. § 44–101(6). We recognize that equitable restrictions are generally considered interests in land which come within the provisions of the Statute of Frauds. 5 *Powell on Real Property*, ¶ 671, p. 60–15 (1980). *See* Restatement of Property, § 522 (1944). Nevertheless, we find that both estoppel and part performance apply to the golf course restriction to take it out of the Statute of Frauds. Here Guelich and Associates orally represented to the homeowners that the golf course property retained by them was subject to restrictions which would ·ensure the existence of the golf course until the year 2025. "It would not be fair, under such circumstances, to permit the grantor (*or the grantor's successors taking with notice*) to raise the absence of a writing as a defense." 5 *Powell on Real Property*, ¶ 671, p. 60–20 (1980) (emphasis added). Furthermore, the conduct of the previous owners of the golf course property can only be consistent with the claimed oral representations made by Guelich, and therefore part performance applies to take this matter out of the Statute of Frauds. *Id.* at 60–21. *See Gabitzsch v. Cole*, 95 Ariz. 15, 386 P.2d 23 (1963).

 Appellants contend that the trial court erred in admitting parol evidence to establish restrictions upon the use of the property in violation of the parol evidence rule. It is, of course, well settled in Arizona that parol evidence cannot be used to vary the terms of a written contract. *Arizona Title Ins. & Trust Co. v. Hunter*, 103 Ariz. 384, 442 P.2d 831 (1968). In view of this basic rule, appellants argue that the

homeowners could not vary the terms of the recorded restrictions placed against the Shalimar property. *Cf. Donahoe v. Marston,* 26 Ariz.App. 187, 547 P.2d 39 (1976); *Riley v. Bear Creek Planning Committee.*

■ We hold that the parol evidence rule does not apply in this case. The imposition of an equitable restriction involved here is not dependent upon nor does it purport to vary an integrated written contract for the sale of an interest in real property. To the contrary, the restrictive covenant implied here is consistent with the terms of the deeds and other recorded restrictions. *See Putnam v. Dickinson,* 142 N.W.2d 111 (N.D.1966). As we develop later, the restriction is imposed against a purchaser with notice because it is implied from the words and actions of predecessors in interest.

### THE MAIN ISSUE

■ We return now to the decision of the trial court. It found that an implied covenant restricting the use of the property to a golf course arose from the sale of adjacent lots to the homeowners. The court found that it was enforceable against appellants as subsequent purchasers who took their ownership with notice of the restriction. We find there is ample evidence to uphold this determination. The equitable remedy invoked here is not defeated by legal principles pertaining to real property which would protect a bona fide purchaser *without* notice. An example may be used to illustrate this. If the original developer and the homeowners all had signed a written restrictive covenant limiting the use of the property to a golf course and the document had not been recorded so as to give constructive notice to the world, appellants would nevertheless be bound by its terms if they had had actual notice of its contents. *See Bradely v. Frazier Park Playgrounds,* 110 Cal.App.2d 436, 242 P.2d 958 (1952).

We turn next to cases relied upon by the homeowners as supporting the decision of the trial court. In *Ute Park Summer Homes Association v. Maxwell Land*

*Grant Co.,* the developer had sold lots in a subdivision of land and distributed maps containing an area marked "golf course." The map was never recorded, nor did any of the deeds contain any reference to the map or to any interest in a golf course. After the lots had been sold, the developers sought to sell the golf course area without restriction to its use. The New Mexico Supreme Court held that lot owners had a legal right to use of the area as a golf course. This right, the court held, came into existence because of maps and representations of the developer's agents. The court said:

> [W]here land is sold with reference to a map or plat showing a park or like open area, the purchaser acquires a private right, generally referred to as an easement, that such area shall be used in the manner designated. As stated, this is a private right and it is not dependent on a proper making and recording of a plat for purposes of dedication.

77 N.M. at 734, 427 P.2d at 253. *Ute Park* is not directly on point because it involved a suit by lot owners directly against the developer and not his successor. Moreover, the court found an implied "easement" which is not urged here. *See Bradley v. Frazier Park Playgrounds; Hackert v. Edwards,* 22 Conn.Sup. 499, 175 A.2d 381 (1961); *Cree Meadows, Inc. (NSL) v. Palmer,* 68 N.M. 479, 362 P.2d 1007 (1961); *Putnam v. Dickinson.*

This brings us to the problem of terminology. We recognize that the rights we uphold here have been referred to, by courts as equitable easements, implied easements, equitable servitudes, implied equitable servitudes, implied grants, implied restrictive covenants, and rights arising by estoppel. The nomenclature used in the reported decisions is not consistent. Suffice it to say we are satisfied that "implied restrictive covenant" sufficiently describes what exists here.

We next discuss the imposition of the implied restrictive covenant against appellants as successors in interest to the developer. The record shows beyond dispute

**44**

that the intervening purchasers from the developers, the Randolphs and then the Hills, knew of the restrictions and complied with them, operating the golf course continuously during their ownership. As for appellants, the trial court found:

At or prior to the time the [appellants] acquired their interest in the subject property, they had actual or constructive notice, they should have known, and they had information on the basis of which they had a duty to inquire and thereby would have learned, of the golf course restrictions. The defendants are not bona fide purchasers without notice.[1]

Appellants argue that their sole duty of inquiry was to check recorded documents and, because they did so and found no restrictions, they should not be bound by an implied restrictive covenant. For this they refer to *Neal v. Hunt*, 112 Ariz. 307, 541 P.2d 559 (1975).

*Neal v. Hunt* involved an unrecorded agreement reserving certain water rights to the former owner of ranch property which changed hands several times. When the property was sold to Hunt, the seller told him the former owner, Neal, "had some claim to water rights on the ranch." 112 Ariz. at 310, 541 P.2d at 562. Hunt searched the county records and found no document of record purporting to reserve any water rights on the ranch. The court commented upon these facts as follows:

We believe that when Collins told Hunt, prior to the sale, that defendant had a water right claim this was sufficient to put Hunt on inquiry. *We believe further that absent other notice, a search of the record was sufficient under the facts in this case.* Defendant, in order to protect his interest, had an obligation to record the instrument, and Hunt had an obligation, once Collins told him of defendant's possible water rights, to ascertain if they were correct.... We will construe recording acts so as to afford the greatest possible protection to

the person who in good faith endeavored to comply with them. (Citation omitted) *We believe Hunt acted reasonably under the circumstances by searching the Mohave County recorder's office. Finding nothing to confirm the existence of the agreement, he cannot now be charged with having had constructive notice of its existence.* (emphasis added) 112 Ariz. at 311, 541 P.2d at 563.

That case is similar to the present case in that the claimed rights were not recorded in the office of the county recorder and, thus, constructive notice could not arise from that source. The cases diverge, however, with respect to actual notice. A subsequent purchaser of a servient tenement is bound to take notice of rights that may be evident upon an inspection of the premises as well as those of which he may learn by an inspection of the records. *See Davis v. Kleindienst*, 64 Ariz. 251, 169 P.2d 78 (1946); *Luke v. Smith*, 13 Ariz. 155, 108 P. 494 (1910). Where a reasonably careful inspection of the premises, followed by inquiry, would disclose the existence of a property right, the grantee of the servient tenement takes title subject to the property right to the extent that his grantor is bound thereby. *Putnam v. Dickinson, quoting McHugh v. Haley*, 61 N.D. 359, 237 N.W. 835 (1931). Stated another way, every person having actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact is charged with constructive notice of the fact in all cases in which, by prosecuting such inquiry, he might have learned such fact. *Bradley v. Frazier Park Playgrounds.*

In *Neal v. Hunt*, inspection of the ranch property apparently would not have put Hunt on notice of Neal's water rights. The court determined that since Hunt inspected the records, he had fulfilled his duty of inquiry. In the present case, the trial court found that appellants did not satisfy their duty of inquiry. This conclusion is supported by the record. There is ample evi-

1. The privity requirement for real covenants is replaced by the notice requirement for equitable restrictions. 5 *Powell on Real Property,* ¶ 673[2], p. 60–68, n. 142 (1980). The requisite notice can be one of three types: actual, constructive or inquiry notice. *Id.* at 60–69.

dence that appellants had actual knowledge of the facts upon which the golf course restriction was based. Appellants were told by their seller that the property was restricted to a golf course. In addition, appellants had actual knowledge of the existence and operation of the golf course. The recorded plat and restrictions were further evidence of the golf course use restriction. Finally, appellants knew that the golf course was surrounded by residential lots which were designed to, and did in fact, take advantage of the views afforded by the golf course. The trial court could properly conclude that appellants were not bona fide purchasers without notice. Consequently, they will not be afforded the protection the law gives to an innocent purchaser. *See Putnam v. Dickinson; Hackert v. Edwards.*

### ECONOMIC FRUSTRATION AND RELATED MATTERS

Appellants next argue that economic frustration renders the golf course restriction unenforceable. They point out that the trial court found that historically the golf course had not been profitable to its owners. They acknowledge that they have never attempted to operate the golf course themselves, but argue that they should not be required to do so and suffer a loss just to show that the golf course is not profitable. Appellants further argue that to require them to actively operate the golf course, even at a loss, amounts to "outright bondage" rather than just a negative restraint on the use of the land.

■ Although changed circumstances may occur that would justify granting of relief from restrictive covenants, *see Williams v. Butler,* 76 N.M. 782, 418 P.2d 856 (1966), such changes must frustrate and defeat the original purpose of the restrictions in order to warrant voiding them. *Murphey v. Gray,* 84 Ariz. 299, 327 P.2d 751 (1958); *Riley v. Stoves,* 22 Ariz.App. 223, 526 P.2d 747 (1974); *Decker v. Hendricks,* 7 Ariz.App. 162, 436 P.2d 940 (1968). The trial court determined that the purpose of the golf course has not been defeated nor frustrated by any change affecting the golf course and the Shalimar subdivisions.

■ A mere change in economic conditions rendering it unprofitable to continue the restrictive use is not alone sufficient to justify abrogating the restrictive covenant. *Welshire, Inc. v. Harbison,* 33 Del.Ch. 199, 91 A.2d 404 (1952); *Murphy v. Gray.* In *Williams v. Butler,* the Supreme Court of New Mexico held that lack of economic feasibility to develop a tract as a golf course, tennis courts, swimming pool and other athletic facilities was not a ground for relieving landowners of the covenants. The court noted that if the original purpose of the covenant can still be realized, it will be enforced even though unrestricted use of the property would be more profitable to its owner, *citing Marra v. Aetna Construction Co.,* 15 Cal.2d 375, 101 P.2d 490 (1940). *See Continental Oil Co. v. Fennemore,* 38 Ariz. 277, 299 P. 132 (1931). We conclude that the record supports the trial court's denial of the claim that changed circumstances warrant abrogating the golf course restriction.

Appellants next assert that they cannot constitutionally be required to maintain their property in a certain manner. They also raise many questions regarding the manner of enforcement of the restriction, such as when must the golf course be opened and how often must it be watered and mowed. Appellants cite no authority for the assertion that it would be unconstitutional to require them to maintain their property as a golf course. We recognize that some New York and English cases sustain the contention that affirmative covenants may not run with the land so as to be enforceable against successors in interest of the original covenantor. *Annot.* 68 A.L.R.2d 1022 (1959). However, considerable authority in the United States is otherwise. *Id. Annot.* 41 A.L.R. 1363 (1926); *Annot.* 102 A.L.R. 781 (1936); *Annot.* 118 A.L.R. 982 (1939). The majority of courts enforce both negative and affirmative covenants which run with the land. *Adaman Mutual Water Co. v. United States,* 278

F.2d 842 (9th Cir.1960); *Fitzstephens v. Watson,* 218 Or. 185, 344 P.2d 221 (1959); *Maule Industries, Inc. v. Sheffield Steel Products, Inc.,* 105 So.2d 798 (Fla.App. 1958).

We recognize that problems may arise regarding the operation of the golf course and, if they do, it may be necessary for the trial court to consider further orders relating thereto. The trial court believed that proper management on the part of appellants, together with cooperation from the homeowners, could make the operation of the golf course feasible. We find the judgment of the court to be a reasonable equitable remedy under the difficult circumstances of this case and will not assume that the possibility of future intervention by the court should render the present judgment unenforceable.

### DURATION OF RESTRICTION

Appellants next argue that the duration of the restriction should continue only for a reasonable length of time instead of the period fixed by the court. They contend that the testimony regarding the duration of the restriction varied to the point that the court could not reasonably establish any fixed period.

■ Contrary to appellants' contention, the court could find from the testimony that the developer represented to the homeowners that the golf course restriction would exist until the year 2000 and then would be renewed for an additional 25 years unless rejected by the majority of the homeowners. The duration of the obligation respecting the use of the property must be determined from the intent of the original promisor and promisee. 5 *Powell on Real Property,* ¶ 678, p. 60–115 (1980).

There is also evidence that the original developer intended the golf course restriction to remain in effect until the year 2000 with a 25 year option for renewal. Karl Guelich was under the mistaken impression that such restriction was provided for in the restrictions which were in fact recorded, providing that they shall run "until January 1, 2000 A.D., after which they shall be automatically extended for a period of 25 years unless an instrument signed by a majority of the then owners of the lots has been recorded agreeing to change the same in whole or in part." Several of the original homeowners testified that Guelich assured them that the golf course restriction was guaranteed by a restrictive covenant in the deed, and that such restriction was "permanent" or that it would be in existence until the year 2025.

It is therefore clear that the intent of the developer and the lot purchasers was that the golf course would exist as such until the year 2025. Yet the question arises as to whether *appellants* knew or should have known of the duration of the implied restrictive covenant so that they should be held to the restriction for the same time period. We note that the trial court did not specifically find that appellants had actual notice of the *duration* of the implied restrictive covenant to maintain the golf course.

■ The investigation made by appellants led to an examination of the restrictions recorded against the Shalimar subdivision property. The trial judge found that appellants did in fact become aware of these restrictions. The restrictions are for the specific purpose of enhancing the view of the golf course for the benefit of the homeowners. Thus, it is reasonable that the golf course use restriction was intended to remain in effect at least as long as the other related restrictions. Further, reasonable inquiry would have led to the homeowners themselves and their understanding of the restriction assuring the existence of the golf course. We conclude that appellants were placed on inquiry notice and, had they made a reasonable investigation, would have learned of the duration of the implied restriction. We therefore reject appellants' contention that they should be subjected to the restriction for only a reasonable length of time.

Finally, appellants argue that the golf course restriction is void as an unreasonable restraint on alienation. Appellants do

not support this assertion with either argument or legal authority, and we therefore reject it. The restriction set forth in the judgment is not an unreasonable restraint against alienation under the circumstances of the case.

For the reasons set forth, the judgment of the trial court is affirmed.

MEYERSON and EUBANK, JJ., concur.