793 P.2d 140

**Gene ROHDE and Erma Rohde, husband and wife, Plaintiffs/Appellants,**

v.

**BEZTAK OF ARIZONA, INC., an Arizona corporation; Summer Set Homeowners Association, an Arizona corporation, Defendants/Appellees.**

No. 2 CA–CV 89–0245.

Court of Appeals of Arizona, Division 2, Department B.

May 3, 1990.

384

Richards and Eisenstein by Steven J. Itkin, Tucson, for plaintiffs/appellants.

Waterfall, Economidis, Caldwell, Hanshaw & Villamana, P.C. by Jane L. Eikleberry, Tucson, for defendants/appellees.

## OPINION

FERNANDEZ, Chief Judge.

In their appeal from the granting of summary judgment against them, appellants Gene and Erma Rohde contend that material fact issues exist in their suit for breach of an implied easement of view. They also protest the trial court's award of attorney's

fees to appellees Beztak of Arizona, Inc. and Summer Set Homeowners Association. We affirm.

In late 1986 the Rohdes purchased lot 109 in the Summer Set subdivision in Tucson from Sun County Homes. The subdivision is located in the foothills and covers only one street. The street level rises as one travels from southwest to northeast. The Rohdes' lot is near the beginning of the street. Sometime prior to July 1987, Security Savings foreclosed on 35 lots owned by Sun County in the subdivision. In July 1987, those lots were sold to Beztak which then began developing them.

Beztak began building a home on lot 110, the lot immediately southwest of the Rohdes' lot, shortly after construction began on the Rohdes' home. When the Rohdes' contractor, Yale Epstein, saw Beztak's foreman laying out the two-level house on lot 110, he asked him about its proposed location and height. They also discussed what the view on lot 109 would be. Epstein did not ask to see the house plans nor did he ask about the type of roof it would have. Beztak's foreman testified at his deposition that lot 109 is on a steep hill above lot 110. He testified that he told Epstein he had not seen the blueprints for the lot 110 house and that he knew very little about it because Beztak had not previously built that model. He testified that his job was only to lay out the site and dig the footings. Epstein testified at the hearing on the Rohdes' request for a temporary restraining order that after he talked to the foreman, his "understanding" was "that there would be no obstruction of the view. I had no knowledge of what type of roof was going to be on that house."

The Rohdes' house was completed just before Thanksgiving in 1987. On December 31, 1987, they filed a complaint seeking a preliminary injunction to prohibit Beztak from constructing a pitched roof on the lot 110 house. After a one-day hearing on their request for a preliminary injunction, they withdrew their claim for injunctive relief. Their second amended complaint includes counts for promissory estoppel, breach of contract, breach of an implied easement of view, breach of fiduciary duty, and nuisance. The promissory estoppel claim alleges that Beztak's predecessor in interest made representations to the Rohdes about the views from their lot and that Beztak purchased lot 110 with knowledge of those representations. The Rohdes also alleged that Beztak's foreman represented to their contractor that the lot 110 house would have a flat roof. The breach of contract and breach of fiduciary duty claims allege that Beztak violated the Declaration of Covenants, Conditions and Restrictions (CC & Rs) for the subdivision by failing to submit the house plans for lot 110 to the Architectural Committee for approval and by failing, as majority interest holder in the Summer Set Homeowners Association, to appoint an Architectural Committee. The breach of fiduciary duty count is also against the Summer Set Homeowners Association for failing to appoint an Architectural Committee.

Beztak and the association moved for summary judgment, and the Rohdes responded with a summary judgment motion of their own. They also opposed Beztak's motion on the ground that factual issues exist. They contend on appeal that the trial court erred in granting summary judgment in favor of Beztak, arguing that fact issues exist on the representations made to them on their protected views, on Beztak's failure to inquire about the Rohdes' property rights in the views, and on their claim that the lot 110 house violates the general plan for the development. They also contend the trial court abused its discretion in awarding attorney's fees.

## PROMISSORY ESTOPPEL

It is undisputed that the house on lot 110 has a pitched roof that interferes with the Rohdes' view of downtown Tucson. It is also undisputed that the house complies with applicable zoning requirements. Gene Rohde testified at the preliminary injunction hearing that when they purchased the lot, Sun County's agent told them they had bought one of the best views, which is why they had paid 50% more for the lot. The Rohdes also contend that representations

about the views were made to them in Sun County's brochures that stated:

Live on the ridge high above the valley with city lights glimmering below or view majestic mountain ridges looming high above—offering their soothing tranquility with ever changing hues.

Or—choose a cozy hillside lot overlooking our secluded canyon.

In either case—you can now enjoy the casual carefree lifestyle with a true sense of security in beautiful Summerset.

The Sun County brochure showing the map of the subdivision also states: "Our most prestigious foothill subdivision, now under development, offering outstanding views, value and quality."

In addition, the Rohdes list the conclusory statement in the affidavit of a real estate salesperson who worked for Sun County in January and February 1985 that "[t]he general plan for the development of Amended Summer Set Subdivision included the maximum utilization and preservation of all views which were considered a valuable feature of the lots within that subdivision," the statement in a Beztak newspaper advertisement for its own homes that "[e]ach home will be positioned on its lot to allow for optimum views," and statements in the CC & Rs and the Summerset Architectural Guidelines that Sun County distributed to purchasers of its lots. The CC & Rs provision upon which the Rohdes rely reads as follows:

## ARTICLE V

## ARCHITECTURAL CONTROL

Section 1. No building, fence, wall or other structure shall be commenced, erected, or maintained upon the properties, nor shall any exterior addition to or change or alteration therein, including the exterior color scheme thereof, be made until the plans and specifications showing the nature, kind, shape, height, materials, color, and location of the same shall have been submitted to and approved in writing as to harmony of external design and location in relation to sur-

rounding structures and topography by an architectural committee composed of three (3) or more representatives appointed by the Association.

The provisions of Sun County's Architectural Guidelines upon which the Rohdes rely read as follows:

The design and site placement of each house shall take into account the topography, existing vegetation, orientation, and views unique to each lot.

\*　　\*　　\*　　\*　　\*　　\*

The Architectural Committee will review each submittal carefully for conformance with the various specific requirements contained in the guidelines and standards that follow. The Committee with [sic] vigorously encourage design solutions that feature quality, conformance with natural terrain, suitability in terms of climate and natural elements, and respect for the awesome views and unique grandeur of Summerset!

■ The elements of an action for equitable estoppel are "1) conduct by which one induces another to believe in certain material facts; and 2) the inducement results in acts in justifiable reliance thereon; and 3) the resulting acts cause injury." *Heltzel v. Mecham Pontiac*, 152 Ariz. 58, 61, 730 P.2d 235, 238 (1986). *See also Trollope v. Koerner*, 106 Ariz. 10, 470 P.2d 91 (1970) and *Johnson v. Gilbert*, 127 Ariz. 410, 621 P.2d 916 (App.1980). In order to determine whether the Rohdes have raised a factual issue on their promissory estoppel count, we must analyze the representations upon which they rely. First, we note that, contrary to their complaint allegation, Beztak is not Sun County's successor in interest. Although Beztak purchased the 35 lots that had been owned by Sun County, it purchased those lots from Security Savings after the latter foreclosed on the lots. Beztak did not take over Sun County's development; it built its own models on the lots. We do not see how Beztak can be held liable for representations made by Sun County under those circumstances.

We also note that the representations in Sun County's brochures speak in terms of alternative views. The brochure refers to

views of the city lights *or* views of mountain ridges *or* views of a secluded canyon. The brochure does not guarantee all three views from all lots. The treasurer of the homeowners association testified at the preliminary injunction hearing that she had worked for Sun County and that the lots were designated as ridge view homes, mountain view homes or canyon view homes. She testified that the Rohdes' home is a canyon view home. The Rohdes have not disputed that testimony.

■ Although the CC & Rs refer to "harmony of external design and location in relation to surrounding structures and topography," they nowhere refer to views nor make any specific promises about views. The conclusory statement of the real estate agent who worked for Sun County nearly two years before the Rohdes purchased their lot does not constitute a representation by Beztak. A statement in an undated newspaper advertisement by Beztak sometime after it purchased the lots and long after the Rohdes purchased their lot is also of no use to them. Finally, statements made in Sun County's Architectural Guidelines are also not binding upon Beztak.

The record does not support the Rohdes' claim that promises were made to them by Beztak upon which they justifiably relied to their detriment. Summary judgment on their promissory estoppel claim was thus correct.

### IMPLIED EASEMENT OF VIEW

■ The Rohdes also contend that factual issues precluded entry of summary judgment on their cause of action for breach of an implied easement of view. Their complaint alleges that they had a prior continuous easement of view on their lot that is absolutely necessary for enjoyment of that lot. In support of that cause of action, the Rohdes cite *Shalimar Association v. D.O.C. Enterprises, Ltd.,* 142 Ariz. 36, 688 P.2d 682 (App.1984). They argue that both the language of the CC & Rs and the evidence of their property rights that would be apparent to a subsequent purchaser upon inspection of the property re-

quire Beztak to acknowledge their implied easement.

The leading case in Arizona on the establishment of implied easements is *Porter v. Griffith,* 25 Ariz.App. 300, 543 P.2d 138 (1975). Its language is instructive.

The essential elements of an easement by implication are set out in *Wetmore v. Ladies of Loretto, Wheaton,* 73 Ill. App.2d 454, [461,] 220 N.E.2d 491[, 494] (1966), as follows:

'(1) The existence of a single tract of land so arranged that one portion of it derives a benefit from the other, the division thereof by a single owner into two or more parcels, and the separation of title; (2) before the separation occurs, the use must have been long, continued, obvious or manifest, to a degree which shows permanency; and (3) the use of the claimed easement must be essential to the beneficial enjoyment of the parcel to be benefited.'

. . .

In addition to these three requirements, an implied easement can only be made in connection with a conveyance; that is, an implied easement is based on the theory that whenever one conveys property he includes or intends to include in the conveyance whatever is necessary for its beneficial use and enjoyment.

25 Ariz.App. at 302, 543 P.2d at 140. What the Rohdes have failed to establish or to raise a factual issue about are the latter two elements. They have made no showing that maintenance of the views on their property is a long, continued, obvious or manifest use. Their second amended complaint, filed April 1, 1988, alleges that they were then in the process of moving from California to Arizona. At the time of the preliminary injunction hearing in January 1988, Rohde testified that his wife had moved into the home but that he had not. At that time, the house on lot 110 was substantially finished. There is no question that the roof was substantially in place at that time because its construction had prompted the filing of the lawsuit. Prior to August 1987 when their contractor began construction of their home, the

Rohdes' property had not been used for anything. Thus, they cannot establish the existence of an implied easement of view.

Nor does the case of *Shalimar Association v. D.O.C. Enterprises, supra,* assist the Rohdes. In that case, homeowners adjoining the golf course in a subdivision sued to enforce an implied restrictive covenant. The golf course had been designed and intended as an integral part of the general plan for the subdivision as established by maps showing the golf course, specific wording in the recorded restrictions that referred to the golf course and its location in connection with other structures, and specific promises in the brochures that residents would have access to the golf course by membership. The golf course was constructed in 1960 and 1961. The land on which the course sat was sold in 1979. Because of those facts, the court concluded that an implied covenant required that the property continue to be used as a golf course until the recorded covenants expire in 2025 A.D. No showing of obvious, continued use has been made here.

We conclude that the trial court properly granted summary judgment on the Rohdes' cause of action for breach of an implied easement.

## BREACH OF CONTRACT AND OF FIDUCIARY DUTY

■ The Rohdes also contend that factual issues exist in their causes of action for breach of contract and breach of fiduciary duty. We find no merit to the latter cause of action. The Rohdes have failed to cite any authority for the proposition that either the homeowners association or Beztak, as majority interest holder in the association, owes a fiduciary duty to a member of the association.

The breach of contract claim alleges that Beztak failed to obtain the approval of the Architectural Committee for the plans for the lot 110 house before it commenced construction. The complaint alleges that if the plans had been submitted, the committee would have rejected the plans because the house violates the common scheme for de-velopment of the subdivision. The evidence showed that neither a homeowners association nor an architectural committee existed at the time the lot 110 house was built. The association was incorporated in February 1985 and its articles of incorporation were revoked in January 1987 for failure to file an annual report. It was reincorporated in January 1989. The CC & Rs provide for two classes of members, those who occupy a home on a lot and those who own vacant lots. The first class, class A, has one vote per parcel, and the second, class B, has three votes per parcel. There are 112 lots in the subdivision. Thus, Beztak, as owner of 35 vacant lots in July 1987, had a majority of the votes in the association. The architectural committee is appointed by the association but only after the class A memberships equal the class B memberships.

■ Beztak produced evidence that it showed plans of its model homes to a number of the homeowners shortly before it purchased the 35 lots in the subdivision. It also produced evidence that it had the homeowners association reincorporated and that a new architectural committee was appointed in October 1988 that then approved the plans for lot 110. It is clear from the record that Beztak did indeed breach the CC & Rs by not having the plans for lot 110 approved by the architectural committee prior to the start of construction. In light of the fact that the committee did not then exist, that Beztak was the majority interest holder in the association in any event, and that the Rohdes have failed to establish the existence of an implied easement of view, we find no error in the court's granting of summary judgment on the breach of contract claim.

## ATTORNEY'S FEE AWARD

■ Finally, the Rohdes contest the trial court's award of attorney's fees to appellees. Appellees sought fees of $16,626.60, and the court awarded them $12,000. Citing *Associated Indemnity Corp. v. Warner,* 143 Ariz. 567, 694 P.2d 1181 (1985), the Rohdes argue that the trial court abused its discretion in applying the factors listed

in that case. Rather than engaging in a detailed analysis of those factors, however, the Rohdes argue that the award "could damage the retiree segment of the Arizona housing industry." We find no abuse of discretion in the award.

Appellee will be awarded attorney's fees on appeal upon compliance with Rule 21(c), Ariz.R.Civ.App.P., 17B A.R.S.

Affirmed.

LIVERMORE, P.J., and LACAGNINA, J., concur.