SMITH, Justice.
The United States Bankruptcy Court for the Northern District of Alabama, Southern Division, has certified three questions to this Court pursuant to Rule 18, Ala. R.App. P.

Facts and Procedural History

In its certification to this Court, the Bankruptcy Court provided the following background information:
“In the 1970’s, United States Steel Realty Development Division (‘USR’) began development of the Heatherwood subdivision [in Shelby County]. Part of the development included a parcel to be used as a golf course. Recorded plat maps of the development show or depict this parcel as a golf course. In 1999, HGC Inc. was formed by members of the Heatherwood golf course/club and homeowners in the area. HGC was to operate the Heatherwood golf course and tennis facility. In September 1999, the real property comprising this facility was deeded by USR to HGC. Although the Deed contained various restrictions, covenants and easements, there was no specific provision that required, provided for or referenced the actual or continued use of the property as a golf course.
“In 2000, HGC entered into an Asset Purchase Agreement (‘APA’) with Pine Cone Capital (‘PCC’) whereby PCC purchased all of HGC’s interest, including the real property, that was the Heather-wood golf course. There were numerous drafts before the final agreement was executed. This APA provided that PCC was required to improve the property and to maintain it as a golf course for at least 25 years. PCC assigned all of its rights in the APA to Heatherwood Holdings LLC (‘HH’). HGC then executed a Warranty Deed transferring the property to HH. The restriction or requirement regarding the limited use of this property was not contained or included in the Deed from HGC to HH. At the time the Deed was prepared, an agreement was also drawn up and executed that required HH to operate the golf course for 25 years. This agreement was recorded simultaneously with the Deed.
“HH began operating the golf course and in 2001 borrowed $4 million from First Commercial Bank and executed a Note and Mortgage on this property. There is also a second Mortgage on this property for over $1.5 million that is held by Jonathan Kimerling. HH began having financial problems and in late 2008 notified HGC members that the golf course was about to cease operation. On January 6, 2009, this chapter 11 case was filed and this Adversary Proceeding *1014 was filed by the Debtor [HH] seeking to sell the property for any use, not limited to the golf course.
“HGC argues that there is an implied restrictive covenant, that the Agreement is essentially an express covenant, and that the Deed should be reformed because of a mutual mistake.[1] HGC relies in part on non-Alabama cases to support its position. HH and First Commercial Bank assert that these cases are not applicable; they argue that Alabama case law applies and none of HGC’s arguments are valid.[2]
“This Court views the facts in one non-Alabama case cited[, Shalimar Ass’n v. D.O.C. Enterprises, Ltd,., 688 P.2d 682 (1984),] as similar to the facts presented whereas the Alabama cases do not appear to have the same facts.... [T]his Court finds no clear Alabama precedent, and thus the legal issues presented should be certified to the Alabama Supreme Court to decide these issues.
“Therefore, the following questions are certified to the Alabama Supreme Court:
“1. Whether Alabama law recognizes or will imply a restrictive covenant as to a golf course constructed as part of a residential development consistent with a case with similar facts, Shalimar Ass’n v. D.O.C. Enters., Ltd., 688 P.2d 682 (Ariz.Ct.App.1984)?
“2. Whether Alabama law recognizes an implied restrictive covenant that runs with the land when the Deed conveying the property did not contain an express covenant or restriction but a separate Agreement recorded simultaneously with the Deed and recorded immediately thereafter provided that ‘Buyer covenants that it will operate the purchased assets [the real property] as a golf course for the twenty-five (25) years from the date of execution of this Agreement’?
“3. Whether Alabama law permits the owner of real property to re-sell that property for any use, not limited to the use of a golf course, when the Deed conveying the property did not contain an express covenant or restriction but a separate Agreement recorded simultaneously with the Deed and recorded immediately thereafter provided that ‘Buyer covenants that it will operate the purchased assets [the real property] as a golf course for the twenty-five (25) years from the date of execution of this Agreement’?”

Discussion

I.

To address the first certified question, we first provide a brief background of Alabama law regarding implied restrictive covenants. In Collins v. Rodgers, 938 So.2d 379 (Ala.2006), this Court stated:
“[T]he existence of an implied restrictive covenant is not to be inferred lightly. This Court has recognized that express restrictive covenants are disfavored under Alabama law and are to be strictly construed, with all doubts resolved in favor of the free and unrestricted use of land and against the covenants. See Whaley v. Harrison, 624 So.2d 516 (Ala.1993); Lange v. Scofield, 567 So.2d 1299 (Ala.1990). Logically, if express restrictive covenants are disfavored under the *1015 law, implied restrictive covenants are to be viewed with even less favor.
“Despite the disfavor with which Alabama law views implied restrictive covenants, this Court has enforced implied restrictive covenants under certain situations. See Hall v. Gulledge, 274 Ala. 105, 145 So.2d 794 (1962); Virgin v. Garrett, 233 Ala. 34, 169 So. 711 (1936); Scheuer v. Britt, 218 Ala. 270, 118 So. 658 (1928). However, in more recent cases, this Court has refused to find an implied restrictive covenant. See Ex parte Frazer, 587 So.2d 330 (Ala.1991); Swanson v. Green, 572 So.2d 1246 (Ala.1990).”
938 So.2d at 385. Through a discussion of several cases, this Court in Collins outlined the development of the law in Alabama regarding implied restrictive covenants. See Collins, 938 So.2d at 385-93.[3]
In Hun Es Tu Malade? #16, LLC v. Tucker, 963 So.2d 55 (Ala.2006), this Court stated:
“This Court has recognized repeatedly that an owner of property may adopt a common scheme of development for his property by dividing his property into smaller lots or parcels and conveying those parcels with uniform restrictions. See Collins v. Rodgers, 938 So.2d at 393 (discussing numerous cases involving reciprocal negative easements).
“For example, in Scheuer v. Britt, 218 Ala. 270, 118 So. 658 (1928), this Court stated:
“ ‘ “Where the owner of a tract of land adopts a general scheme for its improvement, dividing it into lots, and conveying these with uniform restrictions as to the purposes for which the lands may be used, such restrictions create equitable easements in favor of the owners of the several lots, which may be enforced in equity by any one of such owners. Such restrictions are not for the benefit of the grantor only, but for the benefit of all purchasers. The owner of each lot has as appurtenant to his lot a right in the nature of an easement upon the other lots, which he may enforce in equity-
“ ‘ “Whether such restriction creates a right which inures to the benefit of purchasers is a question of intention, and to create such right it must appear from the terms of the grant, or from the surrounding circumstances, that the grantor intended to create an easement in favor of the purchaser.” 4 Thompson on Real Property, § 3398.
[[Image here]]
“ ‘... [T]he equitable right to enforce such mutual covenants is rested on the fact that the building scheme forms an inducement to buy, and becomes a part of the consideration. The buyer submits to a burden upon his lot because of the fact that a like burden is imposed on his neighbor’s lot, operating to the benefit of both, and carries a mutual burden resting on the seller and the purchaser.’
“218 Ala. at 271, 118 So. at 660 (emphasis omitted). Thus, Alabama has recognized that a grantor may create reciprocal negative easements by dividing and conveying his property in smaller lots or parcels if, in conjunction with the con *1016 veyances, he includes common restrictions in the deeds to some or all of those parcels. If the grantor so intended, those common restrictions inure to the benefit of all purchasers from that grantor.
“ ‘The question of law which exists in such cases is whether or not the grantor in the deed containing the restriction agreed expressly or impliedly that the restriction is for the benefit of the owner of other property in the subdivision, whether it had been sold or not. Such a contract may be inferred from the circumstances and terms of the instrument, and need not be expressed either verbally or in writing. The test is said to be the intention of the grantor in creating the restriction.’
“Virgin v. Garrett, 233 Ala. 34, 37, 169 So. 711, 713 (1936).
“Thus, we must determine whether the evidence establishes that Clarence Beasley [the grantor] intended a common scheme of development.”
963 So.2d at 65-66.
In Tucker, this Court cited the following five methods of establishing that the original grantor “intended a common scheme of development”: “ ‘ “1) universal written restrictions in all of the deeds of the subdivision; 2) restrictions in a substantial number of such deeds; 3) the filing of a plat showing the restrictions; 4) actual conditions in the applicable subdivision; or 5) acceptance of the actual conditions by the lot owners.” ’ ” 963 So.2d at 66 (quoting Collins, 938 So.2d at 393, quoting in turn Swanson v. Green, 572 So.2d 1246, 1248 (Ala.1990), citing 7 Thompson on Real Property § 3163, p. 124 (1962 repl. vol.)). This Court found that there was sufficient evidence in Tucker indicating an intent to develop the property in accordance with a common scheme. Specifically, this Court noted:
“[T]he property owners presented evidence indicating that [the grantor] owned a large tract of land; that he sold that tract by conveying numerous smaller parcels; that he included in the vast majority of the deeds involved in those conveyances [64 of the 76 deeds in evidence] the same or substantially similar restrictive covenants against commercial development and subdividing the property; that at least some of the purchasers of those parcels relied on the reciprocal nature of those restrictive covenants in deciding to purchase the property; and that, in addition to the three property owners named as plaintiffs in this action, at least some of the other purchasers of property in [the subdivision] believed that [the grantor] had developed his property pursuant to a common scheme.”
963 So.2d at 68.
In Collins, by contrast, this Court concluded that there was not substantial evidence indicating a common scheme of development that included the specific restriction at issue in that case, i.e., a 100-foot building setback. Collins specifically stated: “The residents in this case unquestionably cannot establish a common building scheme using methods 1, 2, or 3 of those recognized in Swanson [v. Green, 572 So.2d 1246 (Ala.1990) ],” 938 So.2d at 395, and the opinion notes that, because of a lack of evidence regarding them, methods 4 and 5 in Swanson could not be addressed.
With this background in mind, we turn to the first certified question: “Whether Alabama law recognizes or will imply a restrictive covenant as to a golf course constructed as part of a residential development consistent with a case with similar facts, Shalimar Ass’n v. D.O.C. Enters., *1017 Ltd., [142 Ariz. 36,] 688 P.2d 682 (Ariz.Ct.App.1984)?” Shalimar involved a residential-land development consisting of a golf course and residential lots surrounding the golf course (the property on which the golf course and the surrounding lots are located is hereinafter referred to as “the Shali-mar property”). The original developer, Karl Guelich and Associates, acquired the Shalimar property in March 1960, and a golf course began operations on the Shali-mar property in 1961. In 1978, the original developer sold the Shalimar property to D.O.C. Enterprises, Ltd. When D.O.C. attempted to develop the golf-course property for other purposes, the surrounding homeowners sued, seeking a declaration that an implied restriction existed limiting the use of the property to a golf course. 142 Ariz. at 37, 688 P.2d at 683. The trial court ruled in favor of the homeowners, and the Arizona Court of Appeals affirmed its judgment. 142 Ariz. at 37, 47, 688 P.2d at 683, 693.
The Arizona Court of Appeals provided the following relevant background information:
“Upon acquiring this land, Guelich and Associates designed a golf course which was intended as an integral part of the general plan for the development and improvement of all the Shalimar property. The plan, including the golf course, was for the purpose of inducing people to buy property in the Shalimar subdivisions and was intended to be for the benefit of those purchasers and their successors in interest. A map showing the proposed development was shown to potential lot buyers and was recorded in the office of the Maricopa County Recorder in August 1960.
“Guelich and Associates also caused to be recorded for Shalimar Estates certain restrictions which contained three paragraphs referring to a golf course:
“‘5. No structure shall be located nearer than thirty feet to any property line abutting on the golf course property....
[[Image here]]
“ ‘9. No fence, wall or hedge over 2 ½ feet high shall be constructed or maintained within the area lying between the front of any building and the front or street property line. No fence, wall or hedge over 6 feet high shall be constructed or maintained on any portion of a lot. Landscaping shall be planned in this area so as to avoid undue obstruction of the view of the golf course from the lots, and all property lines abutting on the golf course shall be fenced with 3 feet high grape stake fencing or equivalent.
[[Image here]]
“‘17. It is contemplated that a golf course may be constructed on that certain part designated as Tract “A” in SHALIMAR ESTATES, and the terms “golf course property” and “golf course” as used herein shall mean the golf course which may be constructed on those tracts as shown by the recorded plat of SHALIMAR ESTATES. (emphasis added)[.]’
“No restrictions were recorded against the golf course property itself (sometimes referred to as ‘Tract A’). The golf course was constructed in 1960 and 1961 in accordance with the configuration and dimensions shown on the recorded plat.
“After this, on October 29, 1963, restrictions were recorded for the residential lots in Shalimar Estates addition number one, which included essentially the same provisions as those earlier quoted, allowing for minor changes.
“Other recorded documents included references to golf course restrictions. For example, the recorded plat for the *1018 Shalimar West subdivision shows an easement for a golf cart path, and the recorded plat for Shalimar Estates addition number four contains a grant of a private irrigation easement to Shalimar Golf Club for its ‘use and enjoyment and its attendant liabilities of upkeep, maintenance and care.’ In addition, brochures and sales materials which depict and describe the golf course were placed on file as a public record with the Arizona Department of Real Estate.
“Residential lot sales began in 1961. The brochures provided to lot purchasers showed a golf course surrounded by numbered home lots.
“Sales were made with representations that the golf course would be maintained as such until the year 2000, with provision for an extension of 25 years. The duration of this promise was to be the same as the period of the recorded restrictions, which provide that the restrictions shall run ‘until January 1, 2000 A.D., after which time they shall be automatically extended for a period of 25 years unless an instrument signed by a majority of the then owners of the lots has been recorded agreeing to change the same in whole or in part.’
“Salesmen for Guelich and Associates promised to develop, maintain, and operate the Shalimar Golf Course for the benefit of residential lots developed by Guelich and Associates. A higher price was charged for lots adjoining the golf course, and they have a greater value because of the existence of a golf course. The homeowners chose lots after looking at the plat prepared by Guelich and Associates showing the golf course and after considering the location of the lots with respect to the golf course.
“The trial court found that when the homeowners acquired their property, sales materials, brochures, maps, and plats were shown and given to them and representations and statements were made to them on the basis of which they had reason to, and did, understand and believe that the golf course would continue to be maintained and used as a golf course. In addition to the specific representations made by salesmen of the developer, Guelich and Associates, there were representations made in the sales materials that:
“ ‘All residents of the subdivision will have access [to the golf course] by membership.... You automatically receive a family membership in Shali-mar Country Club.... A special “drawing card” for home buyers is the fact that Shalimar Estates homes encircle the attractive Shalimar Golf Course....
“ ‘Golf course memberships included at no charge....
“ ‘Shalimar Estates is an exclusive subdivision with 150 homesites. Included in the plans are a new clubhouse for the nine hole golf course to which all residents will have access by membership....
“ ‘Free membership in Shalimar Country Club.... ’
“The trial court also found that the homeowners relied on the plats, sales materials, and statements, and were induced to buy property and to build homes, in part, because the golf course provided an open space and park-like environment for their families, because the continued use and maintenance of the golf course insured that it would not be developed for other homes or businesses, and because they, the homeowners, would be able to join the golf club and play golf next to their homes.
“The trial court found that the homeowners who purchased lots adjoining the golf course had a right to rely and did in *1019 fact rely upon the representations made to them that the use of the golf course was restricted to that purpose for the term of the restrictions.
“The court also found that the homeowners who purchased lots adjoining the golf course would not have bought those lots except for the presence of the golf course and representations that its use was restricted to a golf course and that it would be maintained for that purpose for the term of the restrictions.
“Shalimar Golf Club, Inc., an Arizona corporation, was formed by the principals of the developer and others for the purpose of maintaining and operating the Shalimar Golf Course and it did so from 1961 until July 2, 1979, when the appellants acquired it. In 1976, L.B. Hill and Jane Hill, his wife (the Hills) purchased the subject property from Guelich and Associates and Shalimar Golf Club, Inc. The Hills continued to maintain and operate it as a golf course until July 2, 1979, when they sold it to appellants. All of the prior owners believed the golf course property was required to be used as a golf course and operated it as such.”
142 Ariz. at 37-39, 688 P.2d at 684-85 (capitalization in original).
The Shalimar court affirmed the trial court’s findings (1) “that an implied covenant restricting the use of the property to a golf course arose from the sale of adjacent lots to the homeowners”; (2) “that [the implied covenant] was enforceable against appellants as subsequent purchasers who took their ownership with notice of the restriction.” 142 Ariz. at 43, 688 P.2d at 689. In support of its decision, the Shalimar court stated:
“In Ute Park Summer Homes Association v. Maxwell Land Grant Co.[, 77 N.M. 730, 427 P.2d 249 (1967) ], the developer had sold lots in a subdivision of land and distributed maps containing an area marked ‘golf course.’ The map was never recorded, nor did any of the deeds contain any reference to the map or to any interest in a golf course. After the lots had been sold, the developers sought to sell the golf course area without restriction to its use. The New Mexico Supreme Court held that lot owners had a legal right to use of the area as a golf course. This right, the court held, came into existence because of maps and representations of the developer’s agents. The court said:
“ ‘[W]here land is sold with reference to a map or plat showing a park or like open area, the purchaser acquires a private right, generally referred to as an easement, that such area shall be used in the manner designated. As stated, this is a private right and it is not dependent on a proper making and recording of a plat for purposes of dedication.’
“77 N.M. at 734, 427 P.2d at 253. Ute Park is not directly on point because it involved a suit by lot owners directly against the developer and not his successor. Moreover, the court found an implied ‘easement’ which is not urged here. See Bradley v. Frazier Park Play-grounds[ Inc., 110 Cal.App.2d 436, 242 P.2d 958 (1952) ]; Hackert v. Edwards, 22 Conn.Supp. 499, 175 A.2d 381 (1961); Cree Meadows, Inc. (NSL) v. Palmer, 68 N.M. 479, 362 P.2d 1007 (1961); Putnam v. Dickinson[, 142 N.W.2d 111 (N.D. 1966) ].
“This brings us to the problem of terminology. We recognize that the rights we uphold here have been referred to by courts as equitable easements, implied easements, equitable ser-vitudes, implied equitable servitudes, implied grants, implied restrictive covenants, and rights arising by estoppel. *1020 The nomenclature used in the reported decisions is not consistent. Suffice it to say we are satisfied that ‘implied restrictive covenant’ sufficiently describes what exists here.
“We next discuss the imposition of the implied restrictive covenant against appellants as successors in interest to the developer. The record shows beyond dispute that the intervening purchasers from the developers ... knew of the restrictions and complied with them, operating the golf course continuously during their ownership. As for appellants, the trial court found:
“ ‘At or prior to the time the [appellants] acquired their interest in the subject property, they had actual or constructive notice, they should have known, and they had information on the basis of which they had a duty to inquire and thereby would have learned, of the golf course restrictions. The defendants are not bona fide purchasers without notice.’[4]
“Appellants argue that their sole duty of inquiry was to check recorded documents and, because they did so and found no restrictions, they should not be bound by an implied restrictive covenant. For this they refer to Neal v. Hunt, 112 Ariz. 307, 541 P.2d 559 (1975).
“Neal v. Hunt involved an unrecorded agreement reserving certain water rights to the former owner of ranch property which changed hands several times. When the property was sold to Hunt, the seller told him the former owner, Neal, ‘had some claim to water rights on the ranch.’ 112 Ariz. at 310, 541 P.2d at 562. Hunt searched the county records and found no document of record purporting to reserve any water rights on the ranch. The court commented upon these facts as follows:
“ ‘We believe that when Collins told Hunt, prior to the sale, that defendant had a water right claim this was sufficient to put Hunt on inquiry, We believe further that absent other notice, a search of the record was sufficient under the facts in this case. Defendant, in order to protect his interest, had an obligation to record the instrument, and Hunt had an obligation, once Collins told him of defendant’s possible water rights, to ascertain if they were correct.... We will construe recording acts so as to afford the greatest possible protection to the person who in good faith endeavored to comply with them. (Citation omitted.) We believe Hunt acted reasonably under the circumstances by searching the Mohave County recorder’s office. Finding nothing to confirm the existence of the agreement, he cannot now be charged with having had constructive notice of its existence. (emphasis added)[.]’
“112 Ariz. at 311, 541 P.2d at 563.
“That case is similar to the present case in that the claimed rights were not recorded in the office of the county recorder and, thus, constructive notice could not arise from that source. The cases diverge, however, with respect to actual notice. A subsequent purchaser of a servient tenement is bound to take notice of rights that may be evident upon an inspection of the premises as well as those of which he may learn by *1021 an inspection of the records. See Davis v. Kleindienst, 64 Ariz. 251, 169 P.2d 78 (1946); Luke v. Smith, 13 Ariz. 155, 108 P. 494 (1910). Where a reasonably careful inspection of the premises,' followed by inquiry, would disclose the existence of a property right, the grantee of the servient tenement takes title subject to the property right to the extent that his grantor is bound thereby. Putnam v. Dickinson, quoting McHugh v. Haley, 61 N.D. 359, 237 N.W. 835 (1931). Stated another way, every person having actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact is charged with constructive notice of the fact in all cases in which, by prosecuting such inquiry, he might have learned such fact. Bradley v. Frazier Park Playgrounds.
“In Neal v. Hunt, inspection of the ranch property apparently would not have put Hunt on notice of Neal’s water rights. The court determined that since Hunt inspected the records, he had fulfilled his duty of inquiry. In the present case, the trial court found that appellants did not satisfy their duty of inquiry. This conclusion is supported by the record. There is ample evidence that appellants had actual knowledge of the facts upon which the golf course restriction was based. Appellants were told by their seller that the property was restricted to a golf course. In addition, appellants had actual knowledge of the existence and operation of the golf course. The recorded plat and restrictions were further evidence of the golf course use restriction. Finally, appellants knew that the golf course was surrounded by residential lots which were designed to, and did in fact, take advantage of the views afforded by the golf course. The trial court could properly conclude that appellants were not bona fide purchasers without notice. Consequently, they will not be afforded the protection the law gives to an innocent purchaser. See Putnam v. Dickinson; Hackert v. Edwards.”
142 Ariz. at 43-45, 688 P.2d at 689-91.
The questions in the present case have been certified to us while summary-judgment motions are pending in the Bankruptcy Court. The briefs filed with this Court, however, indicate that the parties vigorously dispute whether the facts in the underlying action are analogous to the facts in Shalimar. We agree with the Bankruptcy Court’s statement that the facts in the present matter are similar to the facts in Shalimar, at least insofar as those facts concern most of the matters surrounding the initial development of the property.[5] Thus, we think that the facts in the present matter, when construed in favor of the nonmovants for a summary judgment in the bankruptcy action, are sufficiently similar to the facts in Shalimar for us to decide, as an abstract question of law, whether the rationale employed in the Shalimar decision is consistent with Alabama law regarding implied restrictive covenants.[6] We answer that question in the affirmative.
*1022 As noted in our discussion of Tucker, supra, and Collins, supra, our caselaw has recognized at least five methods of establishing that an original grantor of property to be developed as a subdivision intended a common scheme of development. Thus, a party seeking to prove that an original grantor intended a common scheme of development may do so by offering evidence of one or more of the following:
“1) universal written restrictions in all of the deeds of the subdivision; 2) restrictions in a substantial number of such deeds; 3) the filing of a plat showing the restrictions; 4) actual conditions in the applicable subdivision; or 5) acceptance of the actual conditions by the lot owners.”
Tucker, 963 So.2d at 66 (emphasis added; additional citations omitted).
In the present case, it is undisputed that before any of the residential lots were sold, the original grantor, United States Steel Realty Development Division (“USR”), filed a plat that identified the property at issue as a golf course, although the plat did not include language expressly stating that the property could be used only as a golf course. Additionally, it is undisputed that all the deeds to the residential lots in the subdivision include some reference to the property at issue as a golf course. Specifically, the deeds were subject to restrictive covenants that were recorded and that required each residential lot to have a storage area for a golf cart and that prohibited the construction of a fence on any lot adjacent to a fairway, tee, or green on the golf course. Further, it is undisputed that the property at issue has consistently been used exclusively as a golf course. This evidence in sufficiently similar to the above-recognized methods for proving the existence of an intent on the part of USR for a common scheme of development; in particular, the evidence summarized above falls under methods (3) (“the filing of a plat showing the restrictions”) and (4) (“actual conditions in the applicable subdivision”).[7] Tucker, 963 So.2d at 66.
“ ‘Nor is it necessary that the restrictive covenant running with the land should be incorporated in the defendant’s deed to take it out of the influence of the statute of frauds; the servitude may be laid on the property by a separate writing, to which he is not a party, if he is in privity with and claiming under one of the parties thereto, and has notice thereof.
“ ‘Here the servitude was laid on the property by the conveyance made by Brown, Duskin & Heilpern to complain *1023 ant in pursuance of the general scheme of improvement, affecting not only the lots conveyed to complainant, but unsold lots then held by complainant’s grantors, including the lots afterwards sold to the defendant.
“ ‘This doctrine is neither strange nor anomalous, as appears from the numerous authorities collected in the note to 21 A.L.R. pages 1300-1326, and finds a striking analogy in the doctrine, often recognized by the court, that where the owner of land lays it off in lots, blocks, and streets, as a subdivision, and the sale of lots is made in reference thereto, and purchases are made on the faith of the act, this operates as a dedication of the street and gives the several lot owners an easement thereon, and this is so without reference to the statute.
‘“On the other hand, it would be strange indeed to hold that one may lay off a subdivision for strictly residential purposes, as a general scheme of improvement, and sell and convey to numerous purchasers on the faith thereof, incorporating in their deeds restrictive covenants as to the use in pursuance of such scheme, that the promoters of the general scheme could destroy the scheme, to the detriment of such purchasers, by selling to others without such restrictions, when they had notice of such general scheme.’ ”
Collins, 938 So.2d at 387 (quoting Scheuer v. Britt, 218 Ala. 270, 273-74, 118 So. 658, 662 (1928) (opinion on rehearing)). This Court has also stated, in Virgin v. Garrett, 233 Ala. 34, 37-38, 169 So. 711, 713 (1936) (quoted in Collins, 938 So.2d at 387-88):
“ ‘One of the most practical tests, supported by common sense and common business experience, is, whether the restriction imposed by the grantor or proprietor upon the granted premises would naturally operate to enhance the value of his adjacent premises, whether retained by him or conveyed to another. If this be so, it is a strong circumstance to indicate that the restriction was not intended for the mere personal benefit of the grantor, but as a permanent servitude beneficial to the owner of the land, whoever he may be, and appendant to the premises. Parker v. Nightingale, 6 Allen [Mass.] 341, 83 Am. Dec. 632. The reported cases are numerous, and almost infinite in their phases of variety, where tracts of land in cities are subdivided into lots, and sold to separate purchasers, subject to restrictions as to the kind of occupations which may or may not be carried on upon them, and even as to the nature and dimensions of the buildings to be erected on the premises. The inquiry, in these cases, has generally been, whether the servitudes or restrictions imposed were of such a nature as to operate as an inducement to purchasers; and, if so, the inclination of the courts has been to construe them as appurtenant to the estate, and intended for the protection, rather than personal to the grantor. If appurtenant, it of course follows the land, being assignable with it, and each grantee can enforce it in equity against each other grantee having notice of it.’ ”
(Quoting McMahon v. Williams, 79 Ala. 288, 291 (1885) (emphasis added).)
In addition to the recorded plat maps and the recorded restrictive covenants in the instant case, there is evidence indicating that USR provided many of the original purchasers of residential lots with general information about the subdivision in a set of documents the parties refer to as the “Heatherwood Documents.” These documents, which USR frequently incorporated into the sales contracts for the residential lots, include several references to *1024 the property at issue as a golf course and state that each owner of a residence in the subdivision will be required to be a member of the “Heatherwood Golf Club” in some capacity.[8] Additionally, USR distributed marketing materials and advertisements describing the subdivision as a golf-course community, and the sign identifying the neighborhood describes it as “a golf course community.” As the court in Shali-mar concluded based on similar materials, these materials, along with the recorded plat map and the recorded restrictions, are substantial evidence indicating that the original grantor intended a common scheme of development that included the golf-course property as an integral part of that development and as an inducement to purchasers of the residential lots.
Accordingly, we answer the first question in the affirmative. In doing so, however, we emphasize that our answer should not be construed as an expression of an opinion on the merits of the underlying case, because it appears that a number of factual disputes remain to be developed. For example, the extent to which the subsequent purchaser of the property at issue would be bound by the implied restriction that the property be used as a golf course may turn on the extent to which the purchaser had notice of the implied restriction. See Shalimar, 142 Ariz. at 43-45, 688 P.2d at 689-91 (discussing the issue of notice).
Additionally, there may be questions regarding the duration of the implied restrictive covenant and whether changed economic circumstances would warrant a judicial declaration terminating the implied restrictive covenant. See Collins, 938 So.2d at 386 (“ Tor want of a better descriptive term this is styled a reciprocal negative easement. It runs with the land sold by virtue of express fastening and abides with the land retained until loosened by expiration of its period of service or by events working its destruction. It is not personal to owners, but operative upon use of the land by any owner having actual or constructive notice thereof.’ ” (quoting Sanborn v. McLean, 233 Mich. 227, 229-30, 206 N.W. 496, 497 (1925) (emphasis added))). In Shalimar, the court consid *1025 ered the argument “that economic frustration render[ed] the golf course restriction unenforceable.” 142 Ariz. at 45, 688 P.2d at 691. The trial court in Shalimar had rejected that argument on the facts before it, and in affirming the trial court’s judgment, the Arizona Court of Appeals stated:
“[The subsequent purchasers] point out that the trial court found that historically the golf course had not been profitable to its owners. They acknowledge that they have never attempted to operate the golf course themselves, but argue that they should not be required to do so and suffer a loss just to show that the golf course is not profitable. Appellants further argue that to require them to actively operate the golf course, even at a loss, amounts to ‘outright .bondage’ rather than just a negative restraint on the use of the land.
“Although changed circumstances may occur that would justify granting of relief from restrictive covenants, see Williams v. Butler, 76 N.M. 782, 418 P.2d 856 (1966), such changes must frustrate and defeat the original purpose of the restrictions in order to warrant voiding them. Murphey v. Gray, 84 Ariz. 299, 327 P.2d 751 (1958); Riley v. Stoves, 22 Ariz.App. 223, 526 P.2d 747 (1974); Decker v. Hendricks, 7 Ariz.App. 162, 436 P.2d 940 (1968). The trial court determined that the purpose of the golf course has not been defeated nor frustrated by any change affecting the golf course and the Shalimar subdivisions.
“A mere change in economic conditions rendering it unprofitable to continue the restrictive use is not alone sufficient to justify abrogating the restrictive covenant. Welshire, Inc. v. Harbison, 33 Del.Ch. 199, 91 A.2d 404 (1952); Murph[e]y v. Gray. In Williams v. Butler, the Supreme Court of New Mexico held that lack of economic feasibility to develop a tract as a golf course, tennis courts, swimming pool and other athletic facilities was not a ground for relieving landowners of the covenants. The court noted that if the original purpose of the covenant can still be realized, it will be enforced even though unrestricted use of the property would be more profitable to its owner, citing Marra v. Aetna Construction Co., 15 Cal.2d 375, 101 P.2d 490 (1940). See Continental Oil Co. v. Fennemore, 38 Ariz. 277, 299 P. 132 (1931). We conclude that the record supports the trial court’s denial of the claim that changed circumstances warrant abrogating the golf course restriction.
[[Image here]]
“We recognize that problems may arise regarding the operation of the golf course and, if they do, it may be necessary for the trial court to consider further orders relating thereto. The trial court believed that proper management on the part of [the subsequent purchasers], together with cooperation from the homeowners, could make the operation of the golf course feasible. We find the judgment of the court to be a reasonable equitable remedy under the difficult circumstances of this case and will not assume that the possibility of future intervention by the court should render the present judgment unenforceable.”
142 Ariz. at 45^6, 688 P.2d at 691-92.

II.

The second certified question asks:
“Whether Alabama law recognizes an implied restrictive covenant that runs with the land when the Deed conveying the property did not contain an express covenant or restriction but a separate Agreement recorded simultaneously with the Deed and recorded immediately thereafter provided that ‘Buyer covenants that it will operate the purchased *1026 assets [the real property] as a golf course for the twenty-five (25) years from the date of execution of this Agreement’?”
The third certified question asks:
“Whether Alabama law permits the owner of real property to re-sell that property for any use, not limited to the use of a golf course, when the Deed conveying the property did not contain an express covenant or restriction but a separate Agreement recorded simultaneously with the Deed and recorded immediately thereafter provided that ‘Buyer covenants that it will operate the purchased assets [the real property] as a golf course for the twenty-five (25) years from the date of execution of this Agreement’?”
These questions refer to the transaction between HGC and HH.[9] It is possible that these questions are asking whether the transaction between HGC and HH is evidence that an implied restrictive covenant did not exist at the time USR created the Heatherwood subdivision. It is also possible that these questions are inquiring as to the applicability of the defense of estoppel to HH or HGC. For example, the second question may be asking whether HGC, as the conveyor of the property at issue in a warranty deed to HH, should be estopped from attempting to enforce against HH the implied restrictive covenant that the property would not be used for purposes other than as a golf course. The third question could be seeking guidance on the applicability of the defense of estoppel to HH. Related to these readings of the second and third questions is an inquiry as to the effect of HH’s notice, if any, of an implied restrictive covenant that existed before the transaction between HGC and HH.
Thus, the second and third questions could be interpreted in multiple ways. They also appear to be centered on issues of estoppel and notice under Alabama law — issues on which it appears to us, in light of our answer to the first certified question, that existing Alabama law is sufficient to guide the Bankruptcy Court as the matter proceeds before it. We therefore decline to answer them and decline to attempt to rephrase the questions in an effort to answer them. See generally Sparks v. Total Body Essential Nutrition, Inc., 27 So.3d 489, 492 (Ala.2009) (rephrasing the question certified by the federal district court). If it appears to the Bankruptcy Court after subsequent developments in the matter before it that there is no clear Alabama precedent to guide that court, it may submit any remaining questions to this Court under Rule 18, Ala.R.App. P.

Conclusion

We answer the first question in the affirmative. We decline to answer the second and third questions.
QUESTION 1 ANSWERED; QUESTIONS 2 AND 3 DECLINED.
COBB, C.J., and LYONS, WOODALL, STUART, BOLIN, PARKER, and SHAW, JJ., concur.
MURDOCK, J., concurs in the result.

. HGC filed a counterclaim and a cross-claim in the adversary proceeding.

. First Commercial Bank, which holds a first mortgage on the golf-course property, and HH filed summary-judgment motions on the claims asserted in HGC's counterclaim and cross-claim.

. Collins includes the following cases in that discussion: Ex parte Frazer, 587 So.2d 330 (Ala.1991); Swanson v. Green, 572 So.2d 1246 (Ala.1990); Hall v. Gulledge, 274 Ala. 105, 145 So.2d 794 (1962); Virgin v. Garrett, 233 Ala. 34, 169 So. 711 (1936); Scheuer v. Britt, 218 Ala. 270, 118 So. 658 (1928); and Sanborn v. McLean, 233 Mich. 227, 206 N.W. 496 (1925).

. In a footnote, the Shalimar court stated:
"The privity requirement for real covenants is replaced by the notice requirement for equitable restrictions. 5 Powell,on Real Property, ¶ 673[2], p. 60-68, n. 142 (1980). The requisite notice can be one of three types: actual, constructive or inquiry notice. Id. at 60-69.”
142 Ariz. at 44 n. 1, 688 P.2d at 690 n. 1.

. As set forth in the remainder of our opinion, there are a number of questions — e.g., questions of economic feasibility, estoppel, notice, etc. — pertaining to the continuing enforceability or vitality of the implied restrictive covenant that may exist in this case.

. Faced with a similar situation in addressing a certified question, this Court has stated:
“As phrased, the certified questions ask this Court to decide an abstract question of law. Unfortunately, the parties here have, for the most part, focused their arguments on the facts of the case rather than on the wisdom of adopting any of the various answers to this abstract question. Basically, the question is, if all facts are as the plaintiff alleges: Is there a theory upon which *1022 the plaintiff may recover in this case? ... The certification of a question of law does not place this Court in a position to decide questions of fact. The defendants' motions for summary judgment are pending in the Federal court. The resolution of factual questions necessary to reach the certified questions is therefore assumed to be in the plaintiff’s favor, and we set out the essentially uncontested facts of the case merely to provide a context within which our answer may be understood.”
Brown Mach. Works & Supply Co. v. Insurance Co. of North America, 659 So.2d 51, 52-53 (Ala.1995).

. In its brief to this Court, HH suggests that an express, unambiguous restriction must exist in some of the documents of record in order for a common plan or scheme and an implied restrictive covenant to exist. See HH's initial brief, pp. 12-14. We disagree. A party seeking to prove that an original grant- or intended a common scheme of development may do so by offering evidence of one or more of the methods cited in Collins and Tucker to establish a common plan or scheme. Those methods include express restrictions, but they also include the "actual conditions in the applicable subdivision” or an "acceptance of the actual conditions by the lot owners.”

. The documents included a document entitled “General Information: Heatherwood GOLF CLUB.” In part, this document states:
"HEATHERWOOD, a planned residential and golf community, is a development of [USR]....
“HEATHERWOOD Golf Club (Club) will include recreations facilities which are described on the attached Exhibit ‘1’. USR will retain sole discretion of design and construction of such facilities. USR will construct and own these facilities.”
(Capitalization in original.) Listed first on Exhibit "I” is "[a]n 18-hole golf course with approximately 6,600 yards in length.” The general-information document also states:
"USR intends to sell the Club facilities and (1) grants to the Club membership the option to buy the facilities for $1,500,000.00 or (2) in the event Club membership does not exercise said option, USR reserves the right to sell the facilities to others, or (3) USR has the option to sell the facilities to the Club membership in an as-is condition at the time of sale for the amount of the Club Member Escrow Account including accumulated interest.”
The general-information document notes that the "Club Member Escrow Account” was "established for the sole purpose of purchasing the Club facilities.”
Finally, the general-information document provides that
“[e]ach homeowner in HEATHERWOOD must be a member of the Club in one of the following classifications of membership:
"Full Membership
"Golf Membership
"Swim & Racquet Membership
"Social Membership.
"In the event a homeowner sells his home, the successor homeowner must become a member of the Club and will be eligible for the same membership classification as the former homeowner.”
(Capitalization in original.)

. In one sense, die second question appears to be contingent upon a negative answer to the first certified question. In other words, it is possible to read the second question as asking, in the event this Court answered the first question in the negative, whether the transaction between HGC and HH would create an implied restrictive covenant that runs with the land. To the extent the second certified question may be construed as asking a question dependent upon a negative answer to the first question, we decline to answer it because we have answered the first certified question in the affirmative.