[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-16020

_____

D.C. Docket Nos. 2:11-cv-02902-CLS, 2:09-bk-00076-TOM

In Re: HEATHERWOOD HOLDINGS, LLC,

Debtor.

_____

HEATHERWOOD HOLDINGS, LLC,

Plaintiff-Appellant,

versus

HGC, INC.,

Defendant-Appellee.

_____

No. 12-16021

_____

D.C. Docket Nos. 2:11-cv-02903-CLS, 2:09-bk-00076-TOM

HEATHERWOOD HOLDINGS, LLC,

Debtor.

_____

CRIMSON PORTFOLIO, LLC,

                        Plaintiff-Appellant,

        versus

HGC, INC.,

                        Defendant-Appellee.
                _____

        Appeals from the United States District Court
          for the Northern District of Alabama
                _____

                (March 27, 2014)

Before CARNES, Chief Judge, TJOFLAT, Circuit Judge, and MARRA,∗ District
Judge.

MARRA, District Judge:

## I. INTRODUCTION

This is an appeal by Heatherwood Holdings, LLC ("Heatherwood") and First

Commercial Bank ("FCB") (hereinafter, "Appellants") of the affirmance by the

United States District Court for the Northern District of Alabama of a final amended

judgment entered by the United States Bankruptcy Court for the Northern District of

Alabama in favor of Appellee HGC, Inc. ("HGC") (hereinafter, "Appellee").

---

∗ Honorable Kenneth A. Marra, United States District Judge for the Southern District of
Florida, sitting by designation.

Appellants challenge the bankruptcy court's determination that there was an implied restrictive covenant limiting the use of real property at issue to a golf course.

## II. BACKGROUND

### A. Facts

United States Steel ("USX") began developing the Heatherwood subdivision in the 1970s in Shelby County, Alabama. The centerpiece of the subdivision was an eighteen-hole golf course. The plat maps for the subdivision's first three sectors showed a golf course at the heart of the subdivision and indicated that all the subdivision's roads would have golf-themed names, such as "Masters Lane" or "Oakmont Road." The first set of general covenants, restrictions and easements for the subdivision also referenced a golf course, requiring each residential lot to have a "golf cart storage area" and barring fences "adjacent to the golf course fairways, tees or greens."

USX began selling residential lots in the subdivision in 1984. The initial purchasers of the subdivision homes had to become members of the Heatherwood Golf Club which USX ran through a subsidiary company, Heatherwood Golf Club, Inc.[1] USX's advertisements emphasized the benefits of membership, inviting prospective purchasers to "[i]magine returning home every day to play Heatherwood's 18-hole golf course," or imagine living in a "beautiful home" with a

---

[1] This is not the same entity as HGC.

"gorgeous golf course included."

USX provided more details about the golf course's role within the subdivision in the promotional materials it provided to prospective buyers.   USX tried to provide these materials–the "Heatherwood Documents"–to all prospective buyers. The documents included descriptions of:   the Club's amenities; the covenants, restrictions, and easements for the lots surrounding the course; and the requirement that any successive purchaser of a home in the subdivision must become a member of the Club.   They also announced USX's intention to eventually sell the Club, outlining three ways the sale could occur.   Those three ways centered around an option USX granted the Club's membership and an escrow agreement it set up to facilitate the members exercising that option.   The option gave the members the right to buy the Club for $1.5 million by October 1, 1999, after which the option would expire.   To help make that purchase possible, the documents explained, the subdivision's homebuyers and other select members of the Club would enter into an escrow agreement, whereby they paid certain amounts into an escrow account held by USX.   Put another way, the Club's members would exercise the option to buy the club, or if the members did not exercise the option, USX could "sell the facilities to others," or USX could exercise its option to sell the facilities to the Club members in as-is condition for the amount in the escrow account, including accumulated interest.

USX completed the Club in 1986.   During that time, USX recorded a second

4

set of general covenants, restrictions, and easements for the subdivision's fourth sector. Like the first set of filings, the fourth sector's filings required each lot to have a "golf cart storage area," and barred fences, walls, or hedges "adjacent to the golf course, fairways, tees, or greens." The fourth sector's filings also included easements on the lots next to the golf course that would "permit the doing of every act necessary and proper to the playing of golf on the golf course adjacent to the lots." USX proceeded to install ten more sectors in the Heatherwood subdivision, filing the same or similar sets of general covenants, restrictions, and easements with each new sector. Some of the lots in these sectors included easements for golf carts to cross homeowner's property to reach the golf course. The golf-cart easements specified that they were "granted [to] benefit the Grantee's land and shall be perpetual and shall run with the land."

USX continued to own and operate the Club until 1999. That May, the Heatherwood Homeowners Association Steering Committee offered to purchase the Club for the amount in the members' escrow account.[2] Mike Wesler testified that purchasing the Club was to ensure control over upgrades to the course and thereby prevent membership losses. In contrast, William Thompson testified that the purchase was to prevent a third party from converting the golf course into housing.

---

[2] The parties disagree on what the Committee's motivation for purchasing the Club was and presented conflicting testimony at the trial from individuals who were members of both the Homeowners Association and the Club.

In June, equity members of the Club, which included some individuals who did not live in the subdivision, formed HGC in order to purchase, operate, and maintain the Club.   On October 8, 1999, a special warranty deed transferred the Club to HGC.

While the special warranty deed included numerous exceptions, none of them restricted HGC or any subsequent owner's use, maintenance, or development of the golf course.   By contrast, when USX transferred golf course properties in other subdivisions it was developing, it included covenants limiting the real property to use as a golf course.   The deed did, however, restrict USX's right to utility easements.   It specified that any new easements should be "selected and located" to avoid "unreasonably interfer[ing] with the operation of the golf course" and required USX to "minimize any disruption of the golf course" when constructing and installing the utilities.

HGC's ownership of the Club would not last long.   The club needed at least $2 million in capital improvements to attract new members and continue operating the Club, but HGC's members were not willing to contribute their own money.   As a result, HGC began soliciting proposals from various golf club management companies for assuming operation and management of the Club.   HGC ultimately decided to transfer the Club to Pine Cone Capital, Inc., run by Jonathan Kimerling and William Ochsenhirt.   HGC chose Pine Cone Capital because of its reputation for running golf courses, its commitment to making capital improvements, and its

6

willingness to agree to commit to operating the property as a golf course for at least twenty-five years.   Over the next few weeks, HGC and Pine Cone Capital would negotiate the terms of the asset purchase agreement.   Numerous drafts of the agreement were exchanged.   The final version of the agreement committed Pine Cone Capital to spending at least $2.5 million on capital improvements to the Club and operating the property as a golf course for the next twenty-five years.

Though Pine Cone Capital was purchasing the Club, it assigned its rights to Heatherwood.   Kimerling and Ochsenhirt formed Heatherwood for the purpose of owning, operating, and managing the Club.   On July 5, 2000, HGC and Heatherwood entered into a side agreement that committed Heatherwood to operating the Club for the next twenty-five years.   That same day HGC conveyed the real property to Heatherwood.   Like the 1999 deed transferring the Club to HGC, the 2000 deed lacked any express restriction limiting the real property to use as a golf course.   The parties recorded both the side agreement and the deed in the Shelby County Probate Court on July 10, 2000.

Heatherwood promptly closed the Club and began renovations.   To secure additional money for its renovations, Heatherwood obtained a $4 million loan from FCB.   Heatherwood secured the loan with, among other things, a first mortgage on the golf course property and Kimerling's personal guarantee of $1 million of the loan.   At trial FCB's representative, Thomas Genetti, testified that FCB agreed to

7

these terms on the assumption that if Heatherwood could not rehabilitate the Club, then FCB could redevelop the land as residential property.   FCB made that assumption despite the fact that Genetti visited the property and saw the subdivision built around the golf club, as well as the signs indicating that the subdivision was a golf community.   Genetti testified he was unaware of the asset purchase agreement and the side agreement's 25-year operation guarantee, and that FCB would have required more collateral if it had known that the property was limited to use as a golf course.   On May 4, 2001, Heatherwood executed:   (1) a promissory note for $4 million; (2) a mortgage and security agreement securing the note; and (3) an assignment of rents and leases.   The mortgage was recorded on May 7, 2001. Heatherwood completed the renovations several months later and reopened the Club in October 2001.

Despite the renovations, the Club did not fare well.   It lost money every year from 2002 to 2008, with six-figure losses in six of those years, and losses exceeding $400,000 in four of them.   Heatherwood's management testified that these losses came from the Club's inability to retain and expand its membership, and that the Club's struggles with membership came from "playability issues," which included the narrowness of the fairways.

In January 2005, Pine Cone Capital acquired Inverness Country Club.   Once Ochsenhirt and Kimerling, the principals of both Pine Cone and Heatherwood,

8

acquired Inverness, they lost interest in the Club's success. Memos from FCB showed that several months after buying Inverness, Ochsenhirt began exploring the option of selling the Club and transferring its members to Inverness. While Heatherwood never tried to transfer the Club's members, it did transfer the Club's furniture–swapping it for less expensive furniture in the Inverness clubhouse. Other facts indicated that Ochsenhirt and Kimerling's commitment to Heatherwood was diminishing, such as the steadily declining totals spent on maintenance for the Club, and the men's locker room losing hot water for some time.

After struggling through several more years of operating the Club, Heatherwood sent a letter to members in December 2008 announcing that it would cease operations at the end of the year. The letter blamed the closure on "some insurmountable obstacles" created by the "recent economic recession."

### B. Procedural History

Heatherwood, the owner, operator and manager of the Heatherwood Golf Club, filed for Chapter 11 bankruptcy on January 6, 2009. Later that month, it filed the adversary proceeding that led to this appeal. The complaint sought a determination of the extent, priority and validity of any liens, interests and encumbrances on the golf course property and a determination that Heatherwood could sell the real property free and clear of all liens, encumbrances and restrictions.

9

The complaint was brought against FCB, Jonathan Kimerling[3] and HGC.   HGC responded to the complaint by asserting that the golf course property was subject to an implied covenant running with the land and restricting its use to operating as a golf course.[4]   In making this claim, HGC relied upon a decision from the Arizona Court of Appeals, Shalimar Ass'n v. D.O.C. Enterprises, Ltd., 688 P.2d 682 (Ariz. Ct. App. 1984).

The bankruptcy court agreed with HGC that the facts in Shalimar were similar to the facts before it and observed that no Alabama state court cases had similar facts.   Based on the lack of clear Alabama precedent, the bankruptcy court certified the following three questions to the Supreme Court of Alabama:

> 1.   Whether Alabama law recognizes or will imply a restrictive covenant as to a golf course constructed as part of a residential development consistent with a case with similar facts, Shalimar Ass'n v. D.O.C. Enters., Ltd., 688 P.2d 682 (Ariz. Ct. App. 1984)?
>
> 2.   Whether Alabama law recognizes an implied restrictive covenant that runs with the land when the Deed conveying the property did not contain an express covenant or restriction but a separate Agreement recorded simultaneously with the Deed and recorded immediately thereafter provided that Buyer covenants that it will operate the purchased assets [the real property] as a golf course for the twenty-five (25) years from the date of execution of this Agreement?
>
> 3.   Whether Alabama law permits the owner of real property to re-sell that

---

[3] The issues related to Kimerling are not before the Court.

[4] HGC also asserted various counterclaims against Heatherwood and crossclaims against FCB and Kimerling.

property for any use, not limited to the use of a golf course, when the Deed conveying the property did not contain an express covenant or restriction but a separate Agreement recorded simultaneously with the Deed and recorded immediately thereafter provided that Buyer covenants that it will operate the purchased assets [the real property] as a golf course for the twenty-five (25) years from the date of execution of this Agreement?

Heatherwood Holdings, LLC v. First Commercial Bank, 61 So. 3d 1012, 1014 (Ala. 2010) (quotation marks omitted).

The Supreme Court of Alabama chose to answer the first question because "the facts in the present matter, when construed in favor of the nonmovants for a summary judgment in the bankruptcy action, are sufficiently similar to the facts in Shalimar for us to decide, as an abstract question of law, whether the rationale employed in the Shalimar decision is consistent with Alabama law regarding implied restrictive covenants."  Id. at 1021.   The Supreme Court of Alabama noted that the similarity of those facts pertain to the "matters surrounding the initial development of the property" and "there are a number of questions–e.g., questions of economic feasibility, estoppel, notice, etc.–pertaining to the continuing enforceability or vitality of the implied restrictive covenant that may exist in this case."  Id. at 1021 & n.5.   The Supreme Court of Alabama went on to explain that:

> our caselaw has recognized at least five methods of establishing that an original grantor of property to be developed as a subdivision intended a common scheme of development. Thus, a party seeking to prove that an original grantor intended a common scheme of development may do so by offering evidence of one or more of the following: 1) universal written restrictions in all of the deeds of the subdivision; 2) restrictions in a

11

substantial number of such deeds; 3) the filing of a plat showing the restrictions; 4) actual conditions in the applicable subdivision; or 5) acceptance of the actual conditions by the lot owners.

Id. at 1022 (citing Hun Es Tu Malade? # 16, LLC v. Tucker, 963 So.2d 55, 66 (Ala. 2006)) (internal quotation marks omitted).

Next, after summarizing the undisputed facts before the bankruptcy court, the Alabama Supreme Court stated that the evidence is "sufficiently similar" to these methods for "proving the existence of an intent… for a common scheme of development; in particular, the evidence summarized above falls under methods (3) ("the filing of a plat showing restrictions") and (4) ("actual conditions in the applicable subdivision.)   Id. at 1022.   In making this statement, the Alabama Supreme Court expressly disagreed with Heatherwood's suggestion that "an express unambiguous restriction must exist in some of the documents of record in order for a common plan or scheme and an implied covenant to exist."   Id. at 1022 n.7.

The Alabama Supreme Court then noted the evidence presented to the bankruptcy court which included: (1) recorded plat maps; (2) recorded restrictive covenants; (3) general information documents that included references to the property as a golf course and which explained that each owner of a residence would be required to be a member of the golf club and (4) marketing materials, advertisements and a sign describing the subdivision as a golf-course community. Id. at 1023-24.   In considering the record before the bankruptcy court, the Alabama

Supreme Court found there was "substantial evidence indicating that the original grantor intended a common scheme of development that included the golf-course property as an integral part of that development and as an inducement to purchasers of the residential lots."   Id. at 1024.   Based on this finding, the Alabama Supreme Court answered the first certified question in the affirmative.   Id.

The Alabama Supreme Court, however, was careful to note that "[i]n doing so, however, we emphasize that our answer should not be construed as an expression of an opinion on the merits of the underlying case, because it appears that a number of factual disputes remain to be developed."   Id.   Examples of those disputes included: (1) "the extent to which the subsequent purchaser of the property at issue would be bound by the implied restriction that the property be used as a golf course may turn on the extent to which the purchaser had notice of the implied restriction;" (2) "the duration of the implied restrictive covenant and whether changed economic circumstances would warrant a judicial declaration terminating the implied restrictive covenant;" and (3) whether "economic frustration rendered the golf course restriction unenforceable." Id.   Finally, while the Alabama Supreme Court did not answer the second and third certified questions, it did observe that they "appear[ed] to be centered on issues of estoppel and notice under Alabama law."   Id. at 1026.

Subsequently, the bankruptcy court held a three day trial to determine whether

there was an enforceable express or implied restrictive covenant.   On July 26, 2011, the bankruptcy court entered its amended memorandum opinion.   Heatherwood Holdings, LLC v. First Commercial Bank (In re Heatherwood Holdings, LLC), 454 B.R. 495 (Bankr. N.D. Ala. 2011).   The bankruptcy court found that the "initial development and marketing of the Heatherwood subdivision, as well as the sign, street names, easements, plat maps and actual use created an implied restrictive covenant restricting the use of the golf course property to use as a golf course."   Id. at 527.   The bankruptcy court also found "ample evidence that [Heatherwood] had actual as well as constructive and inquiry notice of the implied restrictive covenant restricting the property at issue to use as a golf course."   Id. at 528.   Next, the bankruptcy court rejected the estoppel by deed defense based on the "availability of information in open view and for public viewing."   Id. at 530.   The bankruptcy court also rejected claims that the doctrine of integration destroyed an implied restrictive covenant, that the implied restrictive covenant was terminated due to changed economic circumstances, that there was a express restrictive covenant that runs with the land, that the 25-year operation provision was merged into the deed and that an accounting or constructive trust was appropriate.   Id. at 530-36.   In sum, the bankruptcy court denied Heatherwood's application to sell the real estate free and clear of liens, interests and encumbrances.[5]

---

[5] The bankruptcy court's Order did not dispose of all the issues and parties in the adversary

**III. STANDARD OF REVIEW**

In exercising appellate jurisdiction under 28 U.S.C. § 158(d), the Court "independently examine[s] the factual and legal determinations of the bankruptcy court and employ[s] the same standards of review as the district court." IBT Int'l, Inc v. Northern (In re Int'l Admin. Servs., Inc.), 408 F.3d 689, 698 (11th Cir. 2005) (internal quotation marks omitted). Questions of law are subject to de novo review, and findings of fact are subject to a clearly erroneous standard. Id.; see also Spies v. Atl. Gulf Cmyts. Corp. (In re General Dev. Corp.), 84 F.3d 1364, 1367 (11th Cir. 1996) ("While the Bankruptcy Court's factual findings are subject to a clearly erroneous standard, that standard does not apply when determining the propriety of the Bankruptcy Judge's conclusions of law, (i.e.) determination of what law applies or determination of the ultimate legal conclusions resulting from the application of the law to the facts. Legal conclusions made by the Bankruptcy Judge may not be approved by the District Court without an independent determination.")

This Court reviews de novo questions of subject matter jurisdiction. Walden v. Walker (In re Walker), 515 F.3d 1204, 1210 (11th Cir. 2008).

---

proceedings. On August 10, 2011, the bankruptcy court entered an order certifying its amended order and judgment as a final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. As such, the Court has jurisdiction to review the district court's October 24, 2012 final order affirming the bankruptcy court's decision. Dzikowski v. Boomer's Sports & Recreation Center, Inc. (In re Boca Arena, Inc.), 184 F.3d 1285, 1286 (11th Cir. 1999).

15

## IV. DISCUSSION

### A. Jurisdiction over this Appeal.

The Court begins its analysis by assessing its subject matter jurisdiction. "[P]arties cannot waive subject matter jurisdiction, and we may consider subject matter jurisdiction claims at any time during litigation." Belleri v. U.S., 712 F.3d 543, 547 (11th Cir. 2013) (quoting Scarfo v. Ginsberg, 175 F.3d 957, 960 (11th Cir.1999)). Appellees now challenge this Court's subject matter jurisdiction over FCB's appeal, claiming that FCB does not meet the standing requirements of the bankruptcy law's person-aggrieved doctrine and Article III.

The person aggrieved doctrine is a prudential standing requirement courts apply in light of the fact that the bankruptcy code does not define who can appeal a bankruptcy court order. Westwood Cmty. Two Ass'n, Inc. v. Barbee (In re Westwood Cmty. Two Ass'n, Inc.), 293 F.3d 1332, 1334-35 (11th Cir. 2002). "Bankruptcy's person aggrieved doctrine restricts standing more than Article III standing, as it allows a person to appeal only when they are 'directly and adversely affected pecuniarily by the order.'" Id. at 1335 (quoting Harker v. Troutman (In re Troutman Enters., Inc.), 286 F.3d 359, 364 (6th Cir. 2002)). This doctrine limits standing to "those individuals who have a financial stake in the order being appealed," such as when that order "diminishes their property, increases their burdens or impairs their rights." Id.

16

Here, there is no question that the bankruptcy court's order burdens FCB and impairs its rights.   FCB holds title to the real property as mortgagee and the bankruptcy court's order restricts that property to use as a golf course.   See Baldwin Mut. Ins. Co., Inc. v. Henderson, 580 So. 2d 574, 575 (Ala. 1991) (Alabama is a "title theory" state, meaning upon execution of a mortgage legal title passes to the mortgagee).   That restriction clearly impacts the resale value of the property. Because FCB satisfies the person-aggrieved person doctrine, FCB also meets Article III standing requirements.   In re Westwood Cmty. Two Ass'n, Inc., 293 F.3d 1335-36.

## B.  The Merits.

The Court will now address the challenges by FCB and Heatherwood to the bankruptcy court's determination[6] that an implied restrictive covenant exists to restrict the use of this property to use as a golf course.   The bankruptcy court made numerous factual findings in support of this legal conclusion which bear highlighting.   The bankruptcy court found that USX recorded numerous plat maps which identified the property as a golf course and listed the names of the roads in these maps, all of which were derived from the names of golf courses and tournaments.   Moreover, the deeds to each residential lot in the subdivision makes

---

[6] The district court adopted the bankruptcy court's reasoning, therefore the reference to the "bankruptcy court's determination" includes both the district court and bankruptcy court's orders.

reference to the various covenants and easements which note that the Heatherwood subdivision is a planned residential and golf community. The deeds required owners of residential lots to construct a golf cart storage area and prohibit the construction of a fence on those lots adjacent to a fairway, tee or green on the golf course property. Prospective lot purchasers were told that every homeowner must be a member of the Heatherwood Golf Club. USX created various marketing materials highlighting the benefits of living in a golf course community and erected a sign at the entrance of the development noting that the Heatherwood subdivision is a "golf course community." Notably, the community was used exclusively as a golf course community since it began operating in 1986. Lastly, based on testimony from witnesses, the bankruptcy court determined that most, if not all, Heatherwood homeowners were induced to buy based on the inclusion of a golf course in the subdivision and that USX always intended for the Heatherwood subdivision to be a golf course community. The Court sees no basis to disturb these factual findings.

Appellants primarily challenge the bankruptcy court's determination that, based on these facts, there was an implied restrictive covenant. The bankruptcy court correctly followed the law as articulated by the Alabama Supreme Court, and applied the aforementioned facts to that law. Indeed, in addressing the certified questions from the bankruptcy court, the Alabama Supreme Court identified several facts surrounding the initial development of the property that made the instant case

18

similar to the facts in the Shalimar case.   As such, the Alabama Supreme Court decided "as an abstract question of law" that the rationale employed in the Shalimar case was consistent with Alabama law regarding implied restrictive covenants. The Alabama Supreme Court went further to find that the various marketing materials and the recorded plat map and recorded restrictions were substantial evidence that the original grantor intended a common scheme of development that included the golf course community as an integral part of the development.   Thus, FCB and Heatherwood's arguments that USX did not intend to restrict the golf course property's use and there is no implied restrictive covenant is nothing more than an attempt to second-guess the Alabama Supreme Court's answer to the certified question.[7]

The remainder of FCB and Heatherwood's arguments attack factual determinations by the bankruptcy court which this Court concludes should not be disturbed.   The Court will take each in turn.[8]   First, as to the question of whether the bankruptcy court's finding that FCB and Heatherwood were on notice of the implied restrictive covenant, and therefore could not be considered bona fide

---

[7] Nor does the Court find persuasive FCB and Heatherwood's argument that USX did not intend for the community to continue to be operated as a golf course.   There was adequate evidence before the bankruptcy court that USX always planned to sell the property as a golf course.

[8] The Court notes that the Alabama Supreme Court left open several of these issues, including the issue of notice, the defense of estoppel and changed economic circumstances.

purchasers for value, the bankruptcy court found that FCB and Heatherwood had notice.   The finding was well supported by evidence in the record including the testimony of the vice-president of Pine Cone Capital, Inc. and a representative of FCB, both of whom visited the property.   The bankruptcy court did not err when it held that FCB and Heatherwood had actual, constructive and inquiry notice of the implied restrictive covenant.   See Ex Parte Frazer, 587 So. 2d 330, 331-32 (Ala. 1991) (to enforce an implied restrictive covenant, there must be evidence of knowledge of restriction at time of purchase); Wallace v. Frontier Bank, N.A., 903 So. 2d 792 (Ala. 2004)   ("Notice sufficient to preclude a bona fide purchase may be actual or constructive or may consist of knowledge of facts which would cause a reasonable person to make an inquiry which would reveal the interest of a third party." (citing Hill v. Taylor, 235 So. 2d 647, 649 (Ala. 1970)).

Next, the bankruptcy court did not err in finding that most, if not all, of the homeowners within the Heatherwood subdivision bought their home with the expectation that the golf course property would remain a golf course.   See FTC v. Abbvie Prods. LLC, 713 F.3d 54, 69 (11th Cir. 2013) ("For us to conclude that those findings were clearly erroneous, we must be left with the definite and firm conviction that a mistake has been committed after reviewing the evidence as a whole.") (internal quotation marks omitted).   Third, the bankruptcy court did not err in holding that the doctrine of estoppel by deed precluded the enforcement of the

20

covenant.   Again, after reviewing the evidence, the bankruptcy court determined that, based on the availability of information in open view and for public viewing, the estoppel by deed defense fails for both FCB and Heatherwood.   See Jacksonville Pub. Serv. Corp. v. Calhoun Water Co., 219 Ala. 616, 123 So. 79, 81-82 (Ala. 1929) (estoppel by deed requires knowing representation or concealment relied upon by the other party to his or her detriment).   Fourth, with respect to FCB and Heatherwood's argument that the doctrine of integration in the Agreement between HGC and Heatherwood serves to destroy any implied covenant, the bankruptcy court did not err in finding integration does not apply under the facts of this case.   Specifically, the bankruptcy court concluded that, because HGC did not represent every Heatherwood homeowner at the time the Agreement between HGC and FCB was entered, the implied restrictive covenant could not have been destroyed by the Agreement.   See McCown v. Gottlieb, 465 So. 2d 1120, 1123 (Ala. 1985) (a deed from one lot owner in a six-lot subdivision could not void the covenant held by the other five lot members).   Fifth, in considering the doctrine of changed circumstances, the bankruptcy court relied on various factual findings in determining that the homeowners's benefit from the continued existence of the covenant outweighed the detriment borne by FCB and Heatherwood.

Lastly, the Court rejects FCB and Heatherwood's argument that HGC had no standing to enforce the implied restrictive covenant because HGC owned no

21

property.   As correctly noted by the bankruptcy court, the homeowners were brought into the adversary proceeding as indispensable parties and asserted the implied restrictive covenant.   Additionally, all members of HGC are members of the golf club and some own residential lots in the subdivision.   Thus, there was no error in finding that HGC had standing.

## V. CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED.**